Julio C. Gomez, Esq.
GOMEZ LLC ATTORNEY AT LAW
1451 Cooper Road
Scotch Plains, NJ 07076
Tel 908.789.1080
Fax 908.789.1081
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE, INC., PETER CORDI, RAELYNNE MILLER, KAYLA MATEO, ADRIANA PINTO, JAKE BOTHE, AND DOES 1-13, <br><br>         *Plaintiffs*, <br><br>   -against- <br><br> RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY, BOARD OF GOVERNORS, RUTGERS SCHOOL OF BIOMEDICAL AND HEALTH SCIENCES, CHANCELLOR BRIAN L. STROM, PRESIDENT JONATHAN HOLLOWAY, in their official capacities. <br><br>         *Defendants* | **VERIFIED COMPLAINT** <br> **JURY TRIAL DEMANDED** |

**"Data are limited to assess the effect of the vaccine
in preventing asymptomatic infection . . .[or] . . . to assess the effect of the
vaccine against transmission of SARS-CoV-2 from individuals who are
infected despite vaccination."**

*-FDA Briefing Doc. re: Pfizer Vaccine, dated Dec. 10, 2020, pp. 47-48.*
*-FDA Briefing Doc. re: Moderna Vaccine, dated Dec. 17, 2020, p. 49.*
*-FDA Briefing Doc. Re: Janssen (Johnson & Johnson) Vaccine, dated Feb. 26.
2021, p. 57* ("Additional evaluations will be needed to assess the effect of the
vaccine in preventing asymptomatic infection.")

**COVID-19 Cases in New Jersey**
(sourced from *The New York Times*)

August 15, 2020 (no vaccines)     278 new cases / 7-day avg. 428
August 15, 2021 (vaccines available)     1,274 new cases / 7-day avg. 1,673

**Deaths Reported to VAERS
from EUA COVID-19 Vaccines**
12,000+ (as of August 11, 2021)

Plaintiffs Children's Health Defense ("CHD"), Peter Cordi, Raelynne Miller,

Kayla Matteo, Adriana Pinto, Jake Bothe, and Does 1-13 for their Complaint

against Rutgers, The State University of New Jersey, its Board of Governors,

Rutgers School of Biomedical and Health Sciences, President Jonathan Holloway

and Chancellor Brian L. Strom (collectively, "Rutgers" or "Defendants") allege as

follows:

## INTRODUCTION

1.      This is an action to declare Rutgers' COVID-19 vaccine mandate unlawful.  Rutgers' Policy requiring all students to vaccinate for COVID-19 before returning to campus this Fall is both illegal and unconstitutional.[1]  The Policy is not authorized by any federal or state law; it actually conflicts with federal law and so is preempted by federal law; and most importantly, it violates the right to informed consent and to refuse unwanted medical treatment guaranteed by the Fourteenth Amendment, and Article I of the Constitution of the State of New Jersey.  Rutgers' Policy violates the state law requirement in N.J.S.A. 18A:61D-1 to accept evidence of immunity from disease in lieu of vaccination.  And, most importantly, Rutgers' Policy does not satisfy the requirements established by the Supreme Court in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), decided more than 100 years ago.

2.      Fundamentally, the Policy is an affront to human dignity and personal freedom because it violates our basic right to control our bodies.  In a free society, all people have the right to decide their own medical treatment – especially, to

---

[1] *See* Rutgers University Policy Section 10.3.14 available at *https://policies.rutgers.edu/view-policies/academic-%E2%80%93-section-10#3* .

decide what to inject into their bodies.[2]  And every person has the right to make

that decision voluntarily, free from coercion by anyone, and to be fully informed of

the benefits and especially the risks of that decision.

3.     Rutgers University cannot make that decision for its students by

coercing them to get an experimental COVID-19 vaccine to return to campus and

to continue their studies.  Rutgers students face a dilemma: take an experimental

vaccine and risk injury and death – or abandon academic studies at Rutgers.  At

stake are scholarships, enrollments in the Honors Program, athletics and forfeits of

years of study, time and money invested towards a degree that could be lost or

deferred indefinitely if students are forced to leave Rutgers to start over at another,

possibly out-of-state college.  Students cannot simply attend college elsewhere

because almost every college in New Jersey, and many colleges across the country,

following Rutgers' lead, are now requiring COVID-19 vaccines; any transfer could

jeopardize their degrees or delay their graduation indefinitely.

4.     Rutgers' mandate is preempted by federal law because federal law

gives only Congress through FDA the police power to control the administration of

emergency-use authorized vaccines for civilians, and they have never passed a law

---

[2] *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129 (Ct. App. 1914)
("Every human being of adult years and sound mind has a right to determine what
shall be done with his own body.") (Cardozo, J.)

or regulation requiring every person to take emergency-use authorized vaccines for COVID-19.  On the contrary, current federal law gives every person the right to accept or refuse a COVID-19 vaccine.  Rutgers' mandate conflicts with that federal law.

5.     Rutgers' mandate is also *ultra vires* – beyond its authority under New Jersey law – because only our State Legislature, the Governor and the Department of Health have the power to require a particular vaccine for attendance at colleges and universities in New Jersey, and they have not passed a law or regulation requiring COVID-19 vaccines either.  None of these governmental entities have given Rutgers the power to establish immunization requirements or to coerce its students to take experimental vaccines authorized by the FDA with little or no evidence that they are effective at preventing infection or transmission of COVID-19 or its variants, and which pose the risk of injury and death to anyone who takes them.

6.     Even if the federal government were to pass a law mandating or permitting states to mandate emergency-use authorized vaccines for COVID-19, and even if New Jersey were to pass a law requiring these vaccines for attendance at colleges and universities in the State, requiring anyone to take an *experimental* vaccine is a violation of their constitutionally-guaranteed civil right to informed consent, the right to refuse medical treatment, and medical freedom.  Such a

mandate would violate the requirements set forth in the Supreme Court's decision in *Jacobson v. Massachusetts*. And, even if the federal government were to approve or license a COVID-19 vaccine, then the State itself must still pass a law requiring such a vaccine for attendance at colleges and universities in New Jersey. And that law must still meet the requirements of *Jacobson v. Massachusetts* before Rutgers can require COVID-19 vaccination.

7.     Finally, the time has come to apply *Jacobson v. Massachusetts* in light of modern developments in the fields of medical science (e.g. immunology, virology, vaccinology, and holistic medicine) and the current state of law shielding vaccine manufacturers, healthcare providers and government planners from liability to an extraordinary degree. We know more now than ever about the risks, dangers and waning efficacy of vaccination; vaccines have injured and killed tens of thousands of people, and, in less than a year, COVID-19 vaccines have reportedly killed and injured more people than all other federally recommended vaccines tracked in the national Vaccine Adverse Event Reporting System since its inception.[3] Since 1986, vaccine manufacturers and healthcare providers have

---

[3] *See* Vaccine Adverse Event Reporting System at https://vaers.hhs.gov/ . *See also* Megan Redshaw, *VAERS Latest Data Include 2 New Reports of Teen Deaths Following COVID Vaccine as Total Reports of Death Exceed 12,000*, The Defender (August 6, 2021) available at https://childrenshealthdefense.org/defender/vaers-cdc-data-injuries-deaths-covid-vaccine/. "[B]etween Dec. 14, 2020 and July 30, 2021, a total of 545,338 total adverse events were reported to VAERS, including 12,366 deaths — an increase of

escaped liability for virtually all vaccine related injuries and deaths. We also know

more than ever about preventing and treating disease and about enhancing

immunity without vaccination. Vaccines pose serious risks, including death. Their

benefits are not proven to outweigh those risks, even now, during this pandemic.

Moreover, during a pandemic, vaccines may actually contribute to viral mutation

since there is now growing scientific evidence that the worldwide vaccination

program may be exerting pressure on the COVID-19 virus and its variants to

mutate, much like the widespread use of antibiotics has produced deadlier, more

virulent, antibiotic resistant bacterial strains.[4]

8.      Additionally, unjustified fear and insatiable greed drive the vaccine

industry, especially now, during this pandemic, because of the opportunity the

pandemic creates for manufacturers to bring to market expensive, novel and

patentable drugs, vaccines, biologics, treatments, and medical devices that will

reap huge profits. Rutgers has been involved in the clinical trials for all three

COVID vaccines—those of Pfizer, Moderna, and Johnson & Johnson--and will

gain financially from universal mandates for the vaccines it has helped to develop.

---

426 over the previous week. There were 70,105 reports of serious injuries, including deaths, during the same time period — up 7,003 compared with the previous week." *Id.* (with hyperlinks to source data).

[4] Megan Redshaw, *VAERS Latest Data, supra.*

Manufacturers are especially driven to bring risky products to market now because they bear virtually zero liability for any injury their products may cause under the PREP Act permitting emergency use.  42 U.S.C. § 247d-6d.  However, there are available treatments for COVID-19 that make vaccination unnecessary through current medical knowledge developed by front- line doctors (e.g. Front Line COVID-19 Critical Care Alliance (FLCCC)[5] and America's Front Line Doctors (AFLDS)[6]). These medical heroes have treated patients on a daily basis in emergency rooms around the world with success and have labored to identify treatments and medicines that are readily available, with a long history of safety and efficacy. These treatments and drugs include Ivermectin, Hydroxychloroquine, Fluvoxamine, corticosteroids, Vitamin C, Vitamin D3, Quercetin, Zinc and Melatonin; they could be used to bring this pandemic under control and end it.

---

[5] "Formed by leading critical care specialists in March 2020, at the beginning of the Coronavirus pandemic, the 'Front Line COVID-19 Critical Care Alliance' is now a 501(c)(3) non-profit organization dedicated to developing highly effective treatment protocols to prevent the transmission of COVID-19 and to improve the outcomes for patients ill with the disease." *See* https://covid19criticalcare.com/about/ .

[6] "America's Frontline Doctors (AFLDS) stands up for every American looking for the best quality healthcare by empowering doctors working on the front lines of our nation's most pressing healthcare challenges. We help to amplify the voices of concerned physicians and patients nationwide to combat those who push political and economic agendas at the expense of science and quality healthcare solutions. AFLDS is a non-partisan, not-for-profit organization." *See* https://americasfrontlinedoctors.org/about-us/mission-statement/ .

Government officials, mainstream media and social media, however, are suppressing and censoring any discussion of these viable treatments.  But for the prospect of an unlimited market for expensive, patentable, new drugs and global vaccination programs that promise to generate billions of dollars in revenue for their manufacturers and medical allies without any downstream liability, this pandemic would be over by now.

9.      Advances in our understanding of the human body and disease, daily advances in our understanding of COVID-19 and the medicines and therapies available to treat it, pharmaceutical industry capture of the FDA, the CDC, the ACIP and other government agencies (not to mention the medical schools and academic journals); media capitulation to the pharmaceutical industry which has led to biased reporting and censorship; coupled with legal immunity from liability for manufacturers who produce defective vaccines have created an entirely new paradigm nonexistent when the Supreme Court decided *Jacobson v. Massachusetts* in 1905.  Either courts must take this new landscape into consideration when applying *Jacobson*, or, they must modify or overrule this precedent.

10.      Bottom line: neither Rutgers nor any other college or university in the country should be allowed to usurp the authority of the People through their elected officials to decide what vaccines are safe, efficacious, necessary, and accord with the civil rights guaranteed by our state and federal Constitutions.

Plaintiffs call upon this Court to declare Rutgers' mandate of the COVID-19 emergency use authorized vaccine illegal and unconstitutional, and to stop the violation of its students' civil rights.

## PARTIES

**Plaintiffs**

11.     Plaintiff Children's Health Defense, Inc. is a 501(c)(3) non-profit, based in Peachtree City, Georgia, whose members include the individually named student Plaintiffs as well as other students of Rutgers, their parents and legal guardians.  CHD's mission is to end childhood health epidemics by working aggressively to eliminate harmful exposures, hold those responsible accountable, and to establish safeguards.  The harm and injury caused by vaccines has been a focus of CHD for many years.  Additionally, since the start of the pandemic, CHD has consistently produced accurate, well-sourced information concerning COVID-19 generally and COVID-19 vaccines in particular on its website and other venues. CHD educates the public on a daily basis through its website and online newsletter about the risks, injuries and deaths caused by these emergency-use authorized shots which the FDA authorized under the Trump Administration's "Operation Warp Speed."  The official government Vaccine Adverse Event Reporting System (VAERS), co-administered by the FDA and CDC, report 12,000+ deaths and over

500,000 injuries[7].  CHD brings this action on behalf of the student Plaintiffs individually named for the benefit of all others similarly situated, in support of its mission, to defend medical freedom, the right to informed consent, the right to refuse unwanted medical treatment, the right to bodily integrity and to hold Defendants accountable for the violation of Plaintiffs' civil rights.

12.    All individually named Plaintiffs are Rutgers students.  They are either students who recently accepted offers of admission or who have been enrolled at Rutgers for one or more years.  They have reviewed a variety of information about COVID-19 and emergency-use authorized vaccines (from public officials, manufacturers, scientists, news sources, their doctors, family and friends) and reached the individual conclusions that COVID-19 immunization is not medically necessary for them and may cause them physical harm.  As a result, these students have exercised their right to informed consent and to refuse unwanted medical treatment, namely COVID-19 immunization, as it is their right to do under the Fourteenth Amendment and Article 1 of the New Jersey Constitution.  All of the students know that emergency-use authorized COVID-19 vaccines are still under investigation by the FDA; they are still deemed "experimental" in ongoing clinical trials, some of which are conducted by Rutgers;

---

[7] *See* Vaccine Adverse Event Reporting System available at https://vaers.hhs.gov/ .

there is no data about the long-term safety or long-term efficacy of these vaccines; and that according to VAERS and other reports in mainstream news and social media, these vaccines have caused serious harm to young people, are reported to have harmed tens of thousands of people in innumerable ways, and have caused more than 12,000 deaths.  Exercising their right to informed consent, these students have reached the conclusion that the unknown risks of COVID-19 vaccination far outweigh the known risks of the disease for each of them personally.  In the exercise of their right to refuse unwanted medical treatment, these students have decided not to take any COVID-19 vaccines at this time.  Rutgers is threatening to sanction these students by preventing them from continuing their studies at Rutgers because they have exercised these rights of medical freedom.  Some of the individual student Plaintiffs also object to COVID-19 immunization because it would pose unique medical risks to them or because immunization with COVID-19 vaccines conflicts with their religious beliefs, or both.  Rutgers rejected the unique medical contraindications and religious objections that certain students presented.  When Rutgers granted medical and religious exemptions, it discriminated against such students by requiring them to be masked indoors and in congregate settings, by banning them from university dormitories and by reserving the right to impose additional sanctions upon them, sanctions which Rutgers ironically refers to as "reasonable accommodations" under its Policy.

11

Additionally, some of the Plaintiff students, Does 1-13, fear ostracism and retaliation by Rutgers, the faculty, the student body, the media, and the public for exercising their rights to the point that they have asked to proceed anonymously, for as long as the Court may permit.

13.     Plaintiff Peter Cordi is a lifetime member of CHD.  He resides in New Jersey; he will be a senior at Rutgers this Fall; he objects to COVID-19 vaccination on religious and other grounds; he submitted a religious exemption request to Rutgers, but Rutgers has not responded to his request for a religious exemption, and he does not know if he will be allowed to continue his academic studies at Rutgers.

14.     Plaintiff Raelynne Miller is a lifetime member of CHD.  She resides in New Jersey; she will be a junior at Rutgers this Fall; when she enrolled at Rutgers two years ago, she objected to the university's vaccination requirements on religious grounds, but Rutgers rejected her religious exemption request; as a result she was coerced to fully vaccinate to remain enrolled in her nursing studies program and suffered harm and injury from the vaccines she had to take to attend Rutgers; she now objects to COVID-19 vaccination on medical, religious and other grounds and sought a medical exemption from Rutgers with documentation from her pediatrician indicating that she is contraindicated from taking COVID-19 vaccines; Rutgers rejected her initial request for a medical exemption and her

second request, supported by a second doctor's note that she is contraindicated yet that note remains pending; she has also submitted a religious exemption request to Rutgers, but Rutgers has not responded if it will accept it.  Ms. Miller also contracted and recovered from COVID-19 and has natural immunity to the disease as evidenced by a positive antibody test; Rutgers refuses to accept her antibody test in lieu of vaccination in violation of N.J.S.A. 18A:61D-1, or as a basis for a medical exemption even though persons who have recovered from COVID-19 and are positive for antibodies have an increased risk of suffering an adverse reaction to COVID-19 vaccines.

15.    Plaintiff Kayla Matteo is a lifetime member of CHD.  She resides in New Jersey.  She is a registered nurse in the graduate program at Rutgers Camden. She objects to COVID-19 vaccination on religious and other grounds and Rutgers granted her a religious exemption; however, because she exercised her religious right and other rights to refuse vaccination, Rutgers discriminated against her; Rutgers excluded her from university housing, ordered her to be masked indoors and in congregate settings, and may impose additional conditions upon her.

16.    Plaintiff Adriana Pinto is a lifetime member of CHD.  She resides in New Jersey; she will be a senior at Rutgers this Fall.  She objects to COVID-19 vaccination because COVID-19 vaccines would alter her body's natural immunity artificially with unknown and untested chemical substances and technologies that

have not been proven to be safe or effective long-term; she has struggled with her health as a young adult, must adhere to strict requirements to stay healthy and does not want to undertake any unknown risk to her health from COVID-19 vaccines. She is unable to obtain a medical exemption from a doctor, and she does not object to immunization on religious grounds.  She is exercising her right to informed consent under the Fourteenth Amendment and Article 1 and her right to refuse to take a COVID-19 vaccine. Rutgers has threatened to prevent her from completing her studies as a result of her decision to exercise these constitutional rights.  Ms. Pinto also contracted and recovered from COVID-19 and has natural immunity to the disease superior to any alleged immunity that could be achieved with any currently available COVID-19 vaccine.  Moreover, Ms. Pinto is only registered for on-line coursework this Fall, but Rutgers has notified her that it will not exempt her from its Policy even though she is attending remotely.

17.    Plaintiff Jake Bothe is a lifetime member of CHD.  He resides in New Jersey.  He will be a sophomore at Rutgers this Fall.  He objected to COVID-19 immunization on religious and other grounds, and Rutgers granted him a religious exemption; however, because he exercised his religious and other rights to refuse vaccination, Rutgers discriminated against him; Rutgers excluded him from university housing and ordered him to be masked indoors and in congregate settings.

18.     Plaintiff Doe 1 is a lifetime member of CHD.  Doe 1 resides in New Jersey; Doe 1 will be a freshman at Rutgers this Fall; Doe 1 relied on Rutgers' representation that it would not mandate vaccines when Doe 1 accepted the offer of admission; Doe 1 has never vaccinated because Doe 1 objects to vaccinations generally on religious and other grounds; Doe 1 objected to COVID-19 injections on religious and other grounds, and Rutgers granted Doe 1 a religious exemption. However, because Doe 1 exercised Doe 1's religious and other rights to refuse vaccination, Rutgers discriminated against Doe 1.  Rutgers excluded Doe 1 from university housing and ordered Doe 1 to be masked indoors and in congregate settings.  Because residing in university housing is a requirement for Doe 1 to remain enrolled in a selective program at Rutgers, and Doe 1's exclusion from university housing disqualified Doe 1 for that program that Doe 1 worked so hard to gain admission into, Doe 1 surrendered to COVID-19 immunization against Doe 1's will in order to remain in that program.  Doe 1 remains very concerned about the possibility of long-term side effects from a vaccine Rutgers coerced Doe 1 to take.

19.     Plaintiff Doe 2 is a lifetime member of CHD.  Doe 2 resides in New Jersey; Doe 2 will be a freshman at Rutgers this Fall; Doe 2 relied on Rutgers' representation that it would not mandate vaccines when Doe 2 accepted the offer of admission; Doe 2 has never vaccinated because Doe 2 objects to vaccination

generally on religious grounds; Doe 2 objected to COVID-19 injections on religious and other grounds and Rutgers granted her a religious exemption; however, because Doe 2 exercised Doe 2's religious and other rights to refuse vaccination, Rutgers discriminated against Doe 2; Rutgers excluded Doe 2 from university housing and ordered Doe 2 to be masked indoors and in congregate settings.

20.     Plaintiff Doe 3 is a lifetime member of CHD.  Doe 3 resides in New Jersey; Doe 3 will be a sophomore at Rutgers this Fall; Doe 3 objects to COVID-19 injections on religious and other grounds; Doe 3 submitted a religious exemption request to Rutgers, but Rutgers has not responded to Doe 3's request, and Doe 3 does not know if Doe 3 will be allowed to continue Doe 3's academic studies at Rutgers.

21.     Plaintiff Doe 4 is a lifetime member of CHD.  Doe 4 resides in New Jersey; Doe 4 will be a sophomore at Rutgers this Fall; Doe 4 objected to all of Rutgers' vaccination requirements on religious and other grounds when Doe 4 enrolled one year ago; Doe 4 submitted a religious exemption request to Rutgers which Rutgers accepted; nevertheless, Rutgers directed Doe 4 to resubmit another religious exemption request for COVID-19 vaccination specifically; Doe 4 did so but Rutgers has not responded to Doe 4's request for a religious exemption, and

Doe 4 does not know if Doe 4 will be allowed to continue academic studies at Rutgers.

22.    Plaintiff Doe 5 is a lifetime member of CHD.  Doe 5 resides in New Jersey; Doe 5 will be a freshman at Rutgers this Fall; Doe 5 objected to COVID-19 injections on religious grounds, and Rutgers granted Doe 5 a religious exemption; however, because Doe 5 exercised Doe 5's religious and other rights to refuse vaccination, Rutgers discriminated against Doe 5; Rutgers excluded Doe 5 from university housing and ordered Doe 5 to be masked indoors and in congregate settings.  Doe 5 is incurring additional cost and expense to reside off-campus as a result of Defendants' actions.

23.    Plaintiff Doe 6 is a lifetime member of CHD.  Doe 6 resides in New Jersey.  Doe 6 is a member of an athletic team at Rutgers, was heavily recruited, and gave up a Division 1 offer to play Division 3 for Rutgers because Doe 6 felt that Rutgers is where Doe 6 fit best as a student and player; Doe 6 was given an academic scholarship to attend and play for Rutgers.  Doe 6 objects to COVID-19 injections on religious and other grounds; Doe 6 submitted a religious exemption request to Rutgers, but Rutgers has not responded to Doe 6's request for a religious exemption and Doe 6 does not know if Doe 6 will be allowed to continue Doe 6's academic studies at Rutgers, continue athletics, or keep the scholarship; Doe 6 was

told if Doe 6 did receive a religious exemption, although Doe 6 would be allowed to attend classes in-person, Doe 6 would not be eligible to participate in athletics.

24.     Plaintiff Doe 7 is a lifetime member of CHD.  Doe 7 resides in New Jersey; Doe 7 will be a junior at Rutgers this Fall; Doe 7 objects to COVID-19 injections on religious and other grounds; Doe 7 submitted a religious exemption request to Rutgers, but Rutgers has not responded to Doe 7's request, and Doe 7 does not know if Doe 7 will be allowed to continue academic studies at Rutgers.

25.     Plaintiff Doe 8 is a lifetime member of CHD.  Doe 8 resides in New Jersey; Doe 8 will be a junior at Rutgers this Fall; Doe 8 objects to COVID-19 injections  on religious and other grounds and Rutgers granted Doe 8 a religious exemption; however, because Doe 8 exercised Doe 8's religious and other rights to refuse vaccination, Rutgers discriminated against Doe 8; Rutgers excluded Doe 8 from university housing and ordered Doe 8 to wear a mask and socially distance on campus.

26.     Plaintiff Doe 9 is a lifetime member of CHD.  Doe 9 resides in New Jersey and will be a junior at Rutgers this Fall.  Doe 9 contracted and recovered from COVID-19 and has natural immunity to the disease evidenced by a positive antibody test. Rutgers refuses to accept Doe 9's antibody test in lieu of vaccination in violation of N.J.S.A. 18A:61D-1; Doe 9 objects to COVID-19 injections on medical grounds because she contracted and recovered from COVID-19.  COVID-

19 vaccines are contraindicated for Doe 9 because Doe 9 possesses natural immunity; Doe 9 objects to COVID-19 injections because it conflicts with Doe 9's religious beliefs; Doe 9 submitted a religious exemption request and a medical exemption request to Rutgers; Doe 9 also submitted a test result indicating that Doe 9 is positive for antibodies to SARS-CoV-2 and possesses natural immunity and had asked that Rutgers accept this evidence of lieu of a record of COVID-19 vaccination; Doe 9's natural immunity is superior to the immunity that is allegedly induced by any currently available COVID-19 vaccine; Rutgers denied Doe 9 a medical exemption but granted a religious exemption; however, because Doe 9 exercised her religious and other rights to refuse vaccination Rutgers discriminated against Doe 9; Rutgers excluded Doe 9 from university housing and ordered Doe 9 to be masked indoors and in congregate settings.  Doe 9 is incurring additional cost and expense to reside off-campus as a result of Defendants' actions.

27.    Plaintiff Doe 10 is a lifetime member of CHD.  Doe 10 resides in New Jersey.  Doe 10 will be a junior at Rutgers this Fall.  In the Fall semester, Doe 10 will be enrolled only in on-line courses but Rutgers will not exempt Doe 10 from its Policy.  Doe 10 recovered from Covid-19 and tested high for antibodies, which prompted Doe 10's physician to write a medical exemption which was submitted to Rutgers, along with the antibody test results.  Rutgers denied Doe 10's medical exemption request.  Doe 10 objects to COVID-19 injections on religious and other

grounds; Doe 10 submitted a religious exemption request to Rutgers, but Rutgers has not responded to Doe 10's request for a religious exemption and Doe 10 does not know if Doe 10 will be allowed to continue academic studies at Rutgers.

28.     Plaintiff Doe 11 is a lifetime member of CHD.  Doe 11 resides in New Jersey.  Doe 11 will be a freshman this Fall.  Doe 11 was awarded a scholarship and was required to reside on campus for athletics.  Doe 11 relied on Rutgers' representation that it would not mandate vaccines when Doe 11 accepted the offer of admission.  Doe 11 objected to COVID-19 immunization on religious and other grounds and Rutgers granted Doe 11 a religious exemption.  However, because Doe 11 exercised Doe 11's religious and other rights to refuse vaccination Rutgers discriminated against Doe 11.  Rutgers excluded Doe 11 from university housing, ordered Doe 11 to be masked indoors and in congregate settings, and may impose additional conditions.

29.     Plaintiff Doe 12 is a lifetime member of CHD.  Doe 12 resides in New Jersey.  Doe 12 will be a freshman at Rutgers this Fall.  Doe 12 objected to COVID-19 injections on religious grounds and other grounds and Rutgers granted Doe 12 a religious exemption.  However, because Doe 12 exercised Doe 12's religious and other rights to refuse vaccination Rutgers discriminated against Doe 12.  Rutgers excluded Doe 12 from university housing and ordered Doe 12 to be masked indoors and in congregate settings.  Doe 12's requirement to wear a mask

may also interfere with Doe 12's course of study since Rutgers is still deciding whether Doe 12 can participate fully in the field Doe 12 practices.

30.    Plaintiff Doe 13 is a lifetime member of CHD.  Doe 13 resides in New Jersey.  Doe 13 will be a freshman at Rutgers in the Fall.  Doe 13 objects to COVID-19 injections on religious and other grounds; Doe 13 submitted a religious exemption request to Rutgers, but Rutgers has not responded to Doe 13's request for a religious exemption and Doe 13 does not know if Doe 13 will be allowed to continue academic studies at Rutgers.  Anticipating that Rutgers may bar Doe 13 from university housing, Doe 13 has secured off-campus housing at additional expense.

**Defendants**

31.    Defendant Rutgers, The State University of New Jersey, is an educational entity established and operated as a corporation pursuant to state law, designated "the State University of New Jersey," including all departments, colleges, schools, centers, branches, educational and other units and extensions thereof, including the state college for the benefit of agriculture and the mechanic arts, the agricultural experiment station, the New Jersey agricultural experiment station managed and directed by the board of managers, Douglass college, the Paterson college, the graduate school of social work, the school of ceramics, the departments of higher education, formerly maintained by the university of Newark,

including the college of arts and sciences, the school of business administration

and the school of law, and those, formerly maintained by the college of South

Jersey, including the junior college and the school of law, and all other

departments of higher education maintained by the corporation.  Rutgers has

facilities throughout the state and principal campuses located in Newark, New

Brunswick and Camden; its operations and its principal place of business is in New

Brunswick, New Jersey.  Upon information and belief, Rutgers receives funding

from the federal government and the State of New Jersey.

      32.    Defendant Board of Governors is a body created and organized

pursuant to state law, composed of the President of the Corporation, serving as an

ex-officio non-voting member and fifteen (15) voting members appointed either by

the Governor or the Board of Trustees; the Board of Governors has general

supervision over and is vested with the conduct of the university; the Board of

Governors has the authority and responsibility to determine policies for the

organization, administration and development of the university.  Upon information

and belief, the Board of Governors approved or delegated authority to the Rutgers

School of Biomedical and Health Sciences to promulgate Rutgers' COVID-19

Immunization Policy at issue in this case without adequate consideration of the

matters set forth in this Complaint.  Upon information and belief, the Board of

Governors were motivated, at least in part, to order this mandate by Rutgers'

association with vaccine manufacturers and Rutgers' financial and scientific stake

in vaccine development at the University.  The offices of the Board of Governors

are located in New Brunswick, New Jersey.

33.    Defendant Rutgers School of Biomedical and Health Sciences is the

umbrella organization for eight schools and seven centers and institutes at Rutgers

focused on public health, including the medical and dental schools that were

transferred to Rutgers, The State University pursuant to state law beginning in

2013.  The School of Biomedical and Health Sciences also includes the Rutgers

University School of Nursing, the Ernest Mario School of Pharmacy, the Institute

of Health, Health Policy, and Aging Research, and University Behavioral

Healthcare.  Upon information and belief, the School of Biomedical and Health

Sciences developed Rutgers' COVID-19 Immunization Policy without adequate

consideration of the matters set forth in this Complaint.  Upon information and

belief, the School of Biomedical and Health Sciences was motivated, at least in

part, to order this mandate by Rutgers' association with vaccine manufacturers and

Rutgers' financial and scientific stake in vaccine development at the university.

The offices of the School of Biomedical and Health Sciences are located in

Newark, New Jersey.

34.    Defendant Jonathan Holloway is President of Rutgers University and

an ex-officio non-voting member of the Board of Governors, who approved and is

ultimately responsible for enforcing Rutgers' COVID-19 Immunization Policy; his office is located in New Brunswick, New Jersey.

35.     Defendant Brian L. Strom, MD, is Chancellor and Executive Vice President of the Rutgers School of Biomedical and Health Sciences designated as the "Approval Authority" and "Responsible Executive" of Rutgers' COVID-19 Immunization policy at issue in this case; his office is located in Newark, New Jersey.

36.     Defendants' actions, and the vaccination mandate referenced herein, constitute state action taken under color of law.

## JURISDICTION AND VENUE

37.     This case arises under federal law, namely the Fourteenth Amendment of the United States Constitution and 42 U.S.C § 1983, the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, and 21 U.S.C. § 360bbb-3; it also arises under Article 1 of the Constitution of the State of New Jersey, and 18A:61D-1, *et seq.*

38.     This Court has federal question jurisdiction over the subject matter of this case, pursuant to 28 U.S.C. §1331, 1343, and has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).

39.     This Court has authority to grant declaratory relief pursuant to the federal Declaratory Judgments Act, 28 U.S.C. § 2201 and 2202, and appropriate

24

injunctive relief. This Court has authority to award costs and attorney's fees under 42 U.S.C. § 1988.

40.    Venue is proper in this district under 28 U.S.C. §1391(b), because Defendants reside or operate in this District, the Defendant entity, Rutgers School of Biomedical and Health Sciences and its Chancellor, who developed, approved and are responsible for the policy at issue are located in Newark, New Jersey, and a substantial part of the events giving rise to the claims set forth in this Complaint for Declaratory Relief, Injunctive Relief and Damages arose in this District.

41.    This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

## FACTUAL BASIS FOR CLAIMS

### *COVID-19*

42.    On January 20, 2020, in the State of Washington, a 35-year old man who returned from Wuhan, China was confirmed as the first known case of COVID-19 in the United States.

43.    On January 29, 2020, the White House Coronavirus Task Force was established to oversee and coordinate the Trump Administration's response to COVID-19; Alex M. Azar, II, Secretary of Health and Human Services ("HHS") was appointed Chair and Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases, was appointed as a member.

44.     On January 31, 2020, as a result of confirmed cases of COVID-19, Secretary Azar determined that a public health emergency existed as of January 27, 2020, pursuant to §319 of the Public Health Service Act, 42 U.S.C. § 247d *et seq.*

45.     HHS oversaw the public health response with the Centers for Disease Control and Prevention ("CDC") acting as the lead first responder, tracking cases, developing tests, deploying personnel, providing guidance to state and local health departments, and recommending best practices to the public.

46.     The National Institutes of Health ("NIH"), the nation's medical research agency within HHS, worked on the development of a coronavirus vaccine.

47.     On February 26, 2020, Vice President Mike Pence replaced Secretary Azar as Chair of the White House Coronavirus Task Force and Deborah Birx, United States Global AIDS Coordinator, became White House Coronavirus Response Coordinator on the Task Force.

48.     On March 9, 2020, Governor Philip D. Murphy declared a public health emergency and state of emergency in New Jersey as a result of the growing numbers of COVID-19 cases in the state.  Governor Murphy authorized and empowered the State Director of Emergency Management, in conjunction with the Commissioner of the Department of Health, to take emergency measures to protect the public from the possible exposure of COVID-19.

49.     On March 11, 2020, the World Health Organization made the assessment that COVID-19 could be characterized as a pandemic.

50.     Despite declared States of Emergency, even at the height of the pandemic or during any subsequent rise in the number of cases, neither the federal government nor the State of New Jersey, nor any of the above referenced officials or agencies have ever ordered or coerced members of the public to take prophylactic medicines, undergo medical treatments, or vaccinate to contain the spread of COVID-19.

51.     In New Jersey, the number of cases of COVID-19 throughout the course of 2020 (when no vaccines existed) compared with the number of cases of COVID-19 throughout the course of 2021 (when EUA COVID-19 vaccines were in use) are not materially different.  In fact, last year, in New Jersey, the number of COVID-19 cases was lower in August, 2020, when there were no vaccines available, than it is now at the time of the filing of this suit in August, 2021.

52.     On June 4, 2021, Governor Phil Murphy signed a law and executive order ending the COVID-19 public health emergency in New Jersey as a result of the reduced morbidity and mortality of COVID-19 in New Jersey.

*FDA and Emergency-Use Authorization*

53.     The Food, Drug and Cosmetic Act ("FDCA") generally prohibits anyone from introducing or delivering for introduction into interstate commerce

27

any "new drug" or "biological product" unless and until the U.S. Food and Drug Administration (the "FDA") has approved the drug or biological product as "safe and effective for its intended use."  FDCA §§ 301(a), 505(a), 21 U.S.C. §§ 331(a), 355(a); 42 U.S.C. § 262(a).

54.    A vaccine is both a drug and a biological product under the FDCA. FDCA § 201(g), 21 U.S.C. § 321(g); 42 U.S.C. § 262(i)(1).

55.    Under the FDCA, the FDA oversees the review and approval of applications for all drugs, medical devices and biological products in the United States.

56.    Under the FDCA, the FDA is charged with the responsibility to ensure that drugs, medical devices and biological products are safe and effective for public use.

57.    Additionally, the FDA is the only agency authorized to give biologics, including vaccines, emergency use authorization during a public health emergency, despite the fact that such products have not gone through the full FDA review process and therefore cannot be fully determined to be safe and effective. No other federal agency or entity and no State may deviate or conflict with FDA's administration of emergency-use authorized biologics.

58.     Section 564 of the FDCA, 21 U.S.C. § 360bbb-3, authorizes the FDA to issue an "emergency use authorization" ("EUA") for a medical drug, device or biologic, such as a vaccine, under certain emergency circumstances.

59.     Congress passed Section 564 to address a problem raised in emergency situations where, the public could be at risk of exposure to a biological, chemical, radiological, or nuclear agent, and any disease caused by such agents, but where there may not be any previously approved or available countermeasures to treat diseases or conditions caused by such agents.

60.     The purpose of Section 564 is to make available drugs, devices or biological products that have not gone through FDA's full approval process, in the event of a declared emergency if members of the public choose to use them.

61.     Section 564 permits a vaccine to be introduced into interstate commerce and administered to individuals even when FDA has not approved the product for more general distribution pursuant to its standard review process.

62.     Congress enacted Section 564 of the FDCA to vest the Secretary of Health and Human Services with permissive authority to "authorize the introduction into interstate commerce, during the effective period of a declaration of emergency, of a drug, device, or biological product intended for use in an actual or potential emergency…" 21 U.S.C. § 360bbb-3(a)(1).

63.

29

64.    Specifically, Section 564 directs the FDA to impose certain "required conditions" on every EUA product it allows to enter interstate commerce.

65.    Among the "required conditions" that the FDA must establish are "[a]ppropriate conditions designed to ensure that individuals to whom the product is administered are informed" of certain things, including "the option to accept or refuse administration of the product."  FDCA § 564(e)(1)(A)(ii)(III); 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).

66.    Coercion and compulsory COVID vaccine mandates are entirely inconsistent, incompatible, and in direct conflict with these disclosure requirements which require both healthcare workers administering EUA vaccines and vaccine recipients to be informed of the significant known and unknown benefits and risks of such use and the choice to accept or refuse them.

67.    The FDA must ensure that all parties are aware of the "option to accept or refuse" administration of all EUA products and that alternatives are available.

68.    FDA imposes and enforces the "option to accept or refuse" condition by requiring distribution to potential vaccine recipients of a Fact Sheet that states, "It is your choice to receive or not receive [the vaccine]."  This statement is contained in the EUA Fact Sheet for each of the three EUA COVID-19 vaccines.

69.     For the three COVID-19 vaccines, FDA implemented the "option to accept or refuse" condition described in Section 564(e)(1)(A)(ii)(III) in each letter granting the EUA by requiring that FDA's "Fact Sheet for Recipients and Caregivers" be made available to every potential vaccine recipient.  Each Fact Sheet includes the statement that it is your choice to receive or not receive the vaccine.

70.     Section 564 incorporates the principle that unlicensed medical products cannot be mandated.

71.     Congress included the requirement to inform recipients of the option to accept or refuse vaccination because persons have a right under the Due Process Clause of the Fourteenth Amendment to informed consent and to refuse unwanted medical treatment, especially unlicensed products that are still under investigation and therefore experimental.

72.     Under the Due Process Clause, persons also have a right to informed consent and to refuse unwanted medical treatment with licensed products if certain legal requirements are not met.

73.     Under the Due Process Clause and the Supreme Court's decision in *Jacobson v. Massachusetts,* the right to informed consent and to refuse unwanted medical treatment cannot be circumscribed without *legislative* action that weighs the safety, efficacy, necessity, reasonableness, proportionality, and discriminatory

nature of a particular vaccine mandate and permits an exemption to persons who can demonstrate that they possess a particular medical condition that makes them susceptible to harm, injury or death by the mandated vaccine.

74.     To date, Congress has not enacted any amendment to 21 U.S.C. § 360bbb-3, authorizing the Secretary of HHS to mandate any emergency-use authorized drug, device, or biological product, not even COVID-19 vaccination, or to otherwise permit coercion of COVID-19 vaccination, or, to delegate the authority and decision to do so to any State, or any public or private entity.

75.     To date, FDA has not approved or licensed any drug, device or biological product, including any vaccine, for the prevention and treatment of COVID-19.

76.     Additionally, FDA has made clear that, "In an emergency, it is critical that the conditions that are part of the EUA or an order or waiver issued pursuant to section 564A—those that FDA has determined to be necessary or appropriate to protect the public health—***be strictly followed, and that no additional conditions be imposed***."[8]

---

[8] *See* FDA, *Emergency Use Authorization of Medical Products and Related Authorities – Guidance for Industry and Other Stakeholders*, January 2017, available at https://www.fda.gov/media/97321/download .

77.     Notably, aside from the documents posted on its website, the FDA will not release to the public pursuant to the Federal Freedom of Information Act (FOIA), 5 U.S.C § 552 *et seq.*, its communications and exchanges of data or other information with COVID-19 vaccine manufacturers because it claims the vaccines are still under investigation.  As a result, the American public is unable to review and consider all of the information and communications concerning these emergency-use authorized vaccines to make an informed decision about taking them.

### *New Jersey's Legal Framework for Immunization*

78.     In New Jersey, consistent with *Jacobson v. Massachusetts*, only the Governor and the State Legislature possess the police power to require immunizations of the public by passing laws that state and local health authorities administer.

79.     The New Jersey State Legislature and the Governor are the only branches of government empowered to enact specific immunization requirements for specific diseases required in the workplace, schools, colleges and universities or other places of public accommodation by passing such a bill, which must be signed by the Governor.

80.    New Jersey establishes these immunization requirements by passing

laws setting forth which vaccines will be required by schools, institutions of higher

education and places of employment.

81.    In the exercise of that authority the State Legislature, with the

Governor's approval, has enacted laws requiring immunization for specific

diseases for attendance at public and private institutions of higher learning.

82.    New Jersey laws set forth the vaccines that the State requires for

attendance at public and private institutions of higher learning.  *See e.g.* N.J.S.A.

18A:61d-9 (Hepatitis B requirement); N.J.S.A. 18A:62-15.1 (Meningococcal

disease requirement).

83.    New Jersey laws also set forth mandatory exemptions to

immunization that colleges and universities must accept. N.J.S.A. 18A:61D-10.

84.    New Jersey's medical exemption and religious exemption law reads:

"A student shall not be required to receive a vaccination… based upon one of the

following: [A] written statement submitted to the secondary school or institution of

higher education, as applicable, by a licensed physician indicating that the vaccine

is medically contraindicated for a specific period of time and the reasons for the

medical contraindication, based upon valid medical reasons as determined by

regulation of the Commissioner of Health and Senior Services, which shall exempt

the student from the vaccination for the stated period of time" or "a written

statement submitted to the secondary school or institution of higher education, as

applicable, by the student, or the student's parent or guardian if the student is a

minor, explaining how the administration of the vaccine conflicts with the bona

fide religious tenets or practices of the student, or the parent or guardian, as

appropriate; except that a general philosophical or moral objection to the

vaccination shall not be sufficient for an exemption on religious grounds." N.J.S.A.

18A:61D-10.

85.    New Jersey's religious exemption law also commands: "A student

who submits to the institution of higher education a written statement that

immunization conflicts with his religious beliefs shall not be required to submit a

list of immunizations to the institution as a condition of admission or continued

enrollment."  N.J.S.A. 18A:61D-3.

86.    New Jersey law also commands that a student may submit to a college

or university evidence of immunity from a disease in lieu of a record of

vaccination.  N.J.S.A. 18A:61D-1.

87.    Public and private institutions of higher learning are required to

follow these statutes and are not authorized to deviate, modify, or contradict them.

88.    The New Jersey Department of Health ("NJ DOH") is authorized to

promulgate regulations to administer the immunization requirements enacted by

the State Legislature and the Governor.

89.    New Jersey's Administrative Code sets forth all of the immunization requirements for attendance at public and private institutions of higher education in the State, including Rutgers.  N.J.A.C. 8:57-6.1 *et seq.*

90.    New Jersey's Administrative Code recognizes that students at colleges and universities may assert a medical or religious exemption, or both, to the State's immunization requirements. N.J.A.C. 8:57-6.4; 8:57-6.14 (medical exemptions); 8:57-6.15 (religious exemptions).

91.    Pursuant to New Jersey Administrative Code 8:57-6.21, in the event of an outbreak or threatened outbreak, only the Commissioner of New Jersey's Department of Health and Senior Services or local health officers may modify the immunization requirements to meet an emergency.

92.    To date, the State Legislature and the Governor have not enacted any legislation requiring COVID-19 immunization with any emergency-use authorized, or licensed, vaccines for any reason, including for attendance at public or private institutions of secondary education, such as Rutgers.

93.    To date, the NJ DOH has not promulgated any regulation requiring COVID-19 immunization with emergency-use authorized, or licensed, vaccines for any reason including for attendance at public or private institutions of secondary education, such as Rutgers.

94.    Even the Governor of New Jersey on his own has not tried to issue any executive order requiring COVID-19 immunization with any emergency-use authorized, or licensed, vaccine for any workplace, school, institution of higher learning, to attend public events, to enter gyms or restaurants or in any other context, or purported to give any public or private entity the power to mandate COVID-19 vaccination with emergency-use authorized or licensed vaccines against any member of the public.

95.    No law, regulation, executive order, rule or precedent authorizes Rutgers to skirt this entire statutory and regulatory regime and establish, on its own, without any supervision or control, immunization or other medical requirements for students to attend its colleges and universities.  Absent legislative action or executive authorization, Rutgers does not have legal authority to require students to take an emergency-use authorized vaccine which is still under investigation and experimental and to make it mandatory for attendance.

96.    No law, regulation, executive order, rule or precedent delegated to Rutgers any authority to order immunization requirements for students to attend its colleges and universities absent legislative action or executive authorization, much less the authority to require an emergency-use authorized vaccine which is still under investigation and experimental.

97.     Rutgers does not possess the legal authority, the knowledge or objectivity (free from financial incentives or entanglements with vaccine manufacturers) to decide that emergency-use authorized COVID-19 vaccines are safe enough, efficacious enough and necessary for its students to return to campus and that the limited benefits of these vaccines outweigh their risks for this population, the Rutgers community, or the public at large.

*Medical Freedom in the United States*
*The Right to Informed Consent & the Right to Refuse Treatment*

98.     The Fourteenth Amendment's Due Process Clause guarantees to every person medical freedom in the form of the right to informed consent and the right to refuse unwanted medical treatment.

99.     Article I of the New Jersey Constitution also guarantees to every person the right to informed consent, the right to refuse unwanted medical treatment, the right to bodily integrity and medical freedom generally.

100.    The specific rights to informed consent and to refuse treatment, and the general right to medical freedom, emanate from the Fourteenth Amendment's Due Process Clause.

101.    The right to refuse medical treatment carries with it an implied right to the information necessary to make an informed decision about whether to refuse the treatment. Without crucial information about the risks and benefits of a procedure, the right to refuse rings hollow.

38

102.   All persons have the right to exercise informed consent and to refuse unwanted medical treatment voluntarily, and free from coercion by government or otherwise.

*Rutgers' Financial Stakes in EUA COVID-19 Vaccines*

103.   The FDA has not approved COVID-19 vaccines to be "safe and effective" for the prevention and treatment of COVID-19; indeed, to date, FDA has found only that they "may be effective."

104.   All current COVID-19 vaccines on the market as of the date of this filing are merely "authorized" by the FDA as a medical countermeasure for emergency use pursuant to 21 U.S.C. §360bbb-3.  Without formal FDA approval, these vaccines remain under investigation and therefore experimental.  Indeed, on-going clinical studies concerning these vaccines label the dosages for these vaccines under study as "experimental."[9]

105.   FDA and NIH refer to EUA products as both "investigational" and "experimental" and uses those terms interchangeably to describe them.[10]

---

[9] *See* Study to Describe the Safety, Tolerability, Immunogenicity, and Efficacy of RNA Vaccine Candidates Against COVID-19 in Healthy Individuals (NCT04368728) available at
https://clinicaltrials.gov/ct2/show/study/NCT04368728

[10] *See https://www.fda.gov/media/138490/download ; see also*
*https://www.nih.gov/news-events/nih-research-matters/experimental-coronavirus-vaccine-highly-effective .*

106.   As a result, all COVID-19 vaccines that are still in the investigational

phase will remain *de facto* "experimental" for an indefinite period of time.

107.   Rutgers is engaged in the investigational study of all three

experimental EUA COVID-19 vaccines currently available in the United States.

108.   Rutgers has financial ties to all three COVID-19 vaccine

manufacturers: Pfizer, Moderna, and Johnson & Johnson.  In fact, Rutgers has

been selected as a site to conduct COVID-19 vaccine trials for all three

manufacturers on its campuses.

109.   According to Rutgers' website, Rutgers is a clinical trial site for the

Johnson & Johnson Phase 3 clinical research study "to evaluate the safety and

efficacy of Janssen's COVID-19 vaccine candidate."  Thus, Rutgers is mandating

its students take the Johnson & Johnson vaccine whose safety and efficacy it is still

investigating.

110.   According to Rutgers' website, Rutgers is also a clinical trial site for

the global Pfizer-BioNTech research study to evaluate the safety and efficacy of its

COVID-19 vaccine in children aged 6 months to 11 years.  Again, Rutgers is

mandating its students take the Pfizer vaccine whose safety and efficacy it is still

investigating.

111.   Finally, according to Rutgers' website, Rutgers New Jersey Medical

School was selected by Moderna last year as one of the sites to recruit adults to

volunteer for its COVID-19 vaccine trial to test the safety and effectiveness of its vaccine. That clinical trial is ongoing and Rutgers is mandating its students take this vaccine whose safety and effectiveness it is still investigating.

112.   Most notably, Rutgers gives participants in its clinical studies the right to participate voluntarily, but its Policy coerces its own students to take the same vaccine by threatening to disenroll them, or by preventing them from continuing their academic work at Rutgers if they choose to exercise their right to informed consent and refuse unwanted medical treatment.  Ironically, on its website announcing its selection as a site for the Moderna clinical trial, under a photograph of the vaccine vial, the following caption appears: "Enrollment for the Moderna COVID-19 vaccine trial is completely voluntary, meaning no one needs to take the vaccine unless they want to, and all participants will provide informed consent." Rutgers students do not get the same privilege.  If they exercise the right to informed consent and decide to refuse immunization with an emergency-use authorized vaccine, that Rutgers itself is still investigating, they risk being prevented from continuing their academic work at Rutgers.

113.   Rutgers has additional financial ties to these COVID-19 manufacturers.  For example, Rutgers has a strategic partnership with Janssen (Johnson & Johnson) and received $6 million to expand research that will help pharmaceutical companies develop new ways to manufacture prescription

medicines.[11]  Pfizer also funds a million-dollar Fellowship Program at Rutgers'

School of Pharmacy.[12]

114.    Rutgers has additional relationships and financial ties to the

pharmaceutical industry according to its website.[13]

115.    As a result of its financial ties to COVID-19 vaccine manufacturers,

its involvement in clinical trials for all of the currently available COVID-19

vaccines, and its stake in the approval and widespread dissemination and use of

COVID-19 vaccines, Defendants are conflicted from making any objective

decision or imposing any mandate concerning the administration of COVID-19

vaccines upon its students.  Upon information and belief: Defendants took no

action to assuage or resolve this conflict; Defendants have not voted or considered

severing all ties to the pharmaceutical industry in order to adopt the mandate;

Defendants have likely communicated with Pfizer, Moderna, and/or Johnson &

---

[11] *See* Rutgers School of Engineering, *Janssen Expands Collaboration with Rutgers School of Engineering* available at https://soe.rutgers.edu/story/janssen-expands-collaboration-rutgers-school-engineering .

[12] *See* Pfizer, *U.S. Medical, Scientific, Patient and Civic Organization Funding Report, FY2020,* available at *https://cdn.pfizer.com/pfizercom/responsibility/grants_contributions/Yes_Report_FY2020.pdf*

[13] *See* Rutgers Institute for Pharmaceutical Industry Fellowships, *Partner Companies and Brochures* available at https://pharmafellows.rutgers.edu/partner-companies/ .

Johnson executives about a COVID-19 vaccine mandate; Defendants considered the effect that mandating vaccines would have on its relationship with the pharmaceutical industry; and/or Pfizer, Moderna, or Johnson & Johnson likely discussed, encouraged, influenced, or induced Defendants to reverse course on their position to not mandate COVID-19 vaccines.

116.   Upon information and belief, Rutgers was motivated by its financial incentives, its relationship with COVID-19 manufacturers and its investment in the eventual approval and licensure of COVID-19 vaccines to reverse course, abandon its policy that it would not require such vaccines for students to return on campus, and adopt the first such mandate in the United States for a public or private college or university at a time when infection rates were decreasing in New Jersey and around the country.

117.   Upon information and belief, Rutgers will gain financially if every man, woman and child in the state, the country and globally is coerced to take a COVID-19 vaccine it helped to develop.

*Hi-Tech Vaccines, Questionable Efficacy and Safety, Unknown Risks*

118.   Since COVID-19 vaccines employ novel technology never put in widespread use in healthy humans before, because they were only tested on humans for a limited period of time and particular people were intentionally excluded from those clinical trials (e.g. pregnant women and immunocompromised

individuals), and these vaccines are still under investigation in ongoing clinical

trials which deem doses as "experimental," and have only been used by the public

for less than a year, it is impossible to assess or know fully the safety and efficacy

of these vaccines, their necessity, and their proportionality (whether their benefits

outweigh the risks) because so much remains unknown about how, and if, they

work, and what dangers they pose.

119.   According to the FDA, there are insufficient data to know whether the

vaccines authorized for emergency-use[14] - the Pfizer vaccine, the Moderna

vaccine, and the Janssen (Johnson & Johnson) vaccine – actually prevent

asymptomatic infection or prevent transmission of SARS-CoV-2, the virus that

causes COVID-19.  Recent data from the U.S. (in Massachusetts)[15] and abroad (for

---

[14] The Pfizer and BioNTech BNT162b2 COVID-19 vaccine (hereafter, "the Pfizer vaccine"); the ModernaTX mRNA-1273 COVID-19 vaccine (hereafter, "the Moderna vaccine"); the Janssen Biotech, Inc. (Johnson & Johnson) Ad26.COV2.S COVID-19 vaccine (hereafter, "the Johnson & Johnson vaccine") (collectively, "COVID-19 vaccines").

[15] *See* Catherine M. Brown, DVM; Johanna Vostok, MPH; Hillary Johnson, MHS *et al., Outbreak of SARS-CoV-2 Infections, Including COVID-19 Vaccine Breakthrough Infections, Associated with Large Public Gatherings — Barnstable County, Massachusetts*, CDC Morbidity and Mortality Weekly Report MMWR (July 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7031e2.htm?s_cid=mm7031e2_w#suggestedcitation .

44

example, Israel and the United Kingdom)[16] suggest that these vaccines are failing to provide protection against COVID-19, that vaccinated and unvaccinated people are equally likely to carry and spread the virus, and that viral variants, such as the Delta variant, appear to be infecting vaccinated and unvaccinated individuals in roughly equal numbers.

120.    Since there is insufficient evidence that these vaccines can prevent infection or transmission, they cannot promise herd immunity to any inoculated population against SARS-CoV-2 or its variants.  To the extent that anyone is reporting otherwise, misleads the public, because claims of efficacy are not supported by the clinical trials, emerging data or scientific analysis to date.  Not surprisingly, Pfizer is already proposing a winter booster shot.

121.    The FDA has not approved or licensed any vaccine for the prevention or treatment of COVID-19.  Instead, the FDA has authorized three COVID-19 vaccines for emergency use, which merely gives a person the *option* to use these vaccines, voluntarily, while they are not licensed or approved and still under

---

[16] *See* Nathan Jeffay, *Israeli, UK data offer mixed signals on vaccine's potency against Delta strain*, The Times of Israel (July 22, 2021) available at https://www.timesofisrael.com/israeli-uk-data-offer-mixed-signals-on-vaccines-potency-against-delta-strain/; Ian Sample, *Scientists back Covid boosters as study finds post-jab falls in antibodies*, The Guardian (July 22, 2021) https://www.theguardian.com/world/2021/jul/22/uk-scientists-back-covid-boosters-as-study-finds-post-jab-falls-in-antibodies

investigation, during a health emergency only.  Specifically, recipients have the option to accept or refuse these vaccines under federal law, 21 U.S.C. § 360bbb-3(e)(1)(a)(ii)(III), and the right to informed consent guaranteed by the Fourteenth Amendment and the Constitution of the State of New Jersey.

122.   These COVID-19 "vaccines" do not function the way vaccines are expected to work by the public.  As currently understood, the only effect these vaccines **_may_** have demonstrated in clinical trials is reduction of serious clinical disease, or, in other words, they may only lessen a person's symptoms from COVID-19, not stop infection or prevent vaccinated persons from spreading the virus even while they are asymptomatic.  Whether COVID-19 vaccines work effectively at preventing infection or transmission, or even reducing symptoms, remains an open question; rates of COVID today are following the same pattern they followed last year – when COVID-19 vaccines were not available.  COVID-19 vaccines have not been shown to be responsible for any observed reduction in infections or hospitalizations when rates are compared between this year and last year.  According to current data, COVID-19 vaccines are failing against the Delta variant.  Consequently, COVID-19 vaccines may offer a false sense of security and a poor health initiative, rushed through development ("at warp speed"), touted and marketed prematurely to an unsuspecting and fearful public for financial gain.  A COVID-19 vaccine has the potential to be marketed to and even coerced into every

human body on the planet.  No other product in the world holds such financial potential.

123.   Moreover, the effectiveness of COVID-19 vaccines has been vastly overstated to the public with misleading figures which do not account for differences between relative risk and absolute risk reduction for different members of the population.[17]  Meanwhile, the possibility of antibody dependent enhancement – the likelihood that COVID-19 vaccine mediated antibodies could actually make a person more susceptible to infection or exacerbate their disease – has not been adequately acknowledged or studied.[18]

124.   COVID-19 vaccines skipped testing for genotoxicity, mutagenicity, teratogencity, and oncogencity.  In other words, it is unknown whether or not COVID-19 vaccines will change human genetic material, cause birth defects, reduce fertility, or cause cancer.

---

[17] *See* Les Irwig; Judy Irwig, et al., *Relative and Absolute Risks*, Smart Health Choices: Making Sense of Health Advice (2008) available at *https://www.ncbi.nlm.nih.gov/books/NBK63647/* ("Absolute risk reduction (ARR) – also called risk difference (RD) – is the most useful way of presenting research results. . . ").

[18] *See* Wen Shi Lee; Adam K. Wheatley; Stephen J. Kent; Brandon J. DeKosky, *Antibody dependent enhancement and SARS-CoV-2 vaccines and therapies,* Nature Microbiology 5, 1185-1191 (2020) available at https://www.nature.com/articles/s41564-020-00789-5?fbclid=IwAR0MTDI0qIQgLkqnjaYI7vyr-H4Wj2IcNiAQT1hWboXDk0YlIdwaCVgr5xg .

125.   COVID-19 vaccines are considered gene-based vaccines or vaccines produced from gene therapy molecular platforms, whose safety and efficacy has not been fully assessed.  This is unlike all other vaccines where there is a set amount of antigen or a live-attenuated virus in the vaccine.

126.   Additionally, two of these COVID-19 vaccines involve a radical new technology, never approved by the FDA for medical use, and never administered to healthy human beings before.  The risks of taking these mRNA emergency vaccines are not well-known or fully understood.  These vaccines were only tested on human subjects for six (6) months before being released to the public; there is absolutely no knowledge whatsoever of the long-term efficacy or long-term safety of these vaccines.  Clinical trials for these vaccines are scheduled to continue through 2023.  And FDA literature and the clinical studies continue to refer to these biologics as "investigational" or "experimental."  According to the FDA, COVID-19 emergency use-authorized vaccines are not approved for the prevention of COVID-19 and there is no FDA approved vaccine to prevent COVID-19.

127.   COVID-19 vaccines force human cells to produce the spike protein of SARS-CoV-2 in order to trigger an immune response.  Scientists are now learning that the spike protein is itself toxic to the human body.  As far as we know, the process initiated by these vaccines is irreversible; the body's production of the toxic spike protein of SARS-CoV-2 cannot be turned off and could harm or kill a

person if the body does not react as intended or if the body is overcome by the unnatural production of spike protein. The spike protein itself has been demonstrated to injure vital organs such as the brain, heart, lungs, as well as damage blood vessels and directly cause blood clots. Additionally, because these vaccines infect cells within these organs, the generation of spike protein within heart and brain cells in particular, causes the body's own immune system to attack these organs. This is abundantly apparent with the burgeoning number of cases of myocarditis or heart inflammation among individuals below age 30. Today, no one knows the danger of any of these vaccines long term.

128.   Additionally, the mRNA injections are more appropriately categorized as gene therapies that do not fulfill a single criteria or definition of a standard vaccine. These nucleic acid vaccines send the body instructions to produce pieces of the virus with the expectation that the body's immune system mounts a response to the pieces of the virus made by the body.

129.   As use of COVID-19 vaccines expands, more and more people are reporting deaths and injuries caused by these vaccines. FDA suspended the Johnson & Johnson vaccine (albeit temporarily) and is adding more warnings to the labeling of other COVID vaccines as time goes by (*e.g.* anaphylaxis, myocarditis and pericarditis). Under these circumstances no person can exercise fully informed consent when they submit to emergency-use authorized COVID-19

inoculation, and the decision to take one of these vaccines is more akin to roulette than consent.

130.   FDA temporarily suspended the Johnson & Johnson vaccine based on reports of rare and severe blood clots following vaccination.  Labeling for the Pfizer and Moderna vaccines has changed; initially they contained no warnings, now they possess warnings about heart inflammation within just 6 months of release.  It is not an overstatement to say that COVID-19 vaccines constitute the largest biological experiment on the species in human history.

131.   The Vaccine Adverse Event Reporting System ("VAERS") data reveal unprecedented levels of death and other adverse events since the FDA issued Emergency Use Authorizations (EUAs) for the three COVID vaccines.

132.   According to VAERS, these three COVID-19 vaccines have caused more than 12,000 deaths as of the date of this filing.  These are more deaths than have been reported for all other federally-recommended vaccines administered in the United States *combined* over the past 30 years.  Similarly, according to VAERS, these three vaccines have also caused more hospitalizations, more adverse health effects than all other vaccines administered combined since they began tracking this information.  These adverse events include life-threatening anaphylaxis, myocarditis and pericarditis (heart inflammation), blood clotting

disorders, cardiac disorders, miscarriages, Bell's Palsy, Guillain-Barré syndrome and death.

133.   It is well known that VAERS captures only a fraction of the actual injuries caused by vaccines.  In fact, a 2010 federal study commissioned by HHS and performed by Harvard consultants on behalf of the Agency for Healthcare Research and Quality (AHRQ) found that "fewer than 1% of vaccine adverse events" are ever reported to VAERS.[19]  As a result, the COVID-19 vaccines could be responsible for hundreds of thousands or even millions of deaths in the United States in just eight months of use.  If that number is accurate, COVID-19 vaccines could prove more deadly than COVID-19 itself.

134.   Furthermore, the VAERS database is the only safety database to which the public has access.  The government withholds extensive safety information from the public despite having at least ten additional data sources and expert consultants to analyze these data, according to Nancy Messonier, MD, the Director of the National Center for Immunization and Respiratory Diseases.[20]

---

[19] *See* Children's Health Defense Team, *RFK. Jr. Tells Co-Chair of New COVID Advisory Board: VAERS is Broken, You Can Fix It,* The Defender (Dec. 18, 2020) available at https://childrenshealthdefense.org/defender/rfk-jr-david-kessler-covid-vaccine-vaers/ .

[20] *See* FDA Meeting on COVID 19 and Emergency Use Authorization, Part 1 (Video), Dec. 10, 2020 available at https://www.c-span.org/video/?507053-1/fda-meeting-covid-19-vaccine-emergency-authorization-part-1 .

Examples include databases from the Centers for Medicare and Medicaid, the

Veterans Administration, the Defense Department (DMSS), the Vaccine Safety

Datalink and the "Genesis" database, which is operated in cooperation with the

National Institutes of Health and Brown University and includes 250 long-term

care facilities and 35,000 residents.  Upon information and belief, Defendants did

not access any of this information or data before issuing their mandate.

135.   On May 1, 2021, the CDC changed its method for monitoring

reported vaccine "breakthrough" cases, choosing to count only breakthrough cases

that resulted in hospitalizations or death, thereby reducing the number of

breakthrough cases counted for purposes of gauging the actual effectiveness of

COVID-19 vaccines and concealing the true vaccine failure rate from the public.[21]

136.   Defendants have not taken any of these matters into consideration in

mandating their Policy.

<u>Pfizer BioNTech</u>

137.   The Pfizer vaccine for COVID-19 was authorized for emergency use

by the FDA on December 11, 2020.

---

[21] *See* Centers for Disease Control, *COVID-19 Vaccine Breakthrough Case Investigation and Reporting*, available at https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html

138.   Pursuant to FDA's emergency use authorization, Pfizer is required to submit periodic safety reports to the FDA which are not disclosed to the public.

139.   FDA's correspondence to Pfizer dated February 25, 2021, describes the Pfizer vaccine as follows: "It is an investigational vaccine not licensed for any indication."

140.   The EUA Fact Sheet for Recipients and Caregivers of the Pfizer vaccine states, "There is no U.S. Food and Drug Administration (FDA) approved vaccine to prevent COVID-19" . . . "It is your choice to receive the Pfizer-BioNTech COVID-19 vaccine."

141.   Presently, the estimated completion date for the ongoing clinical trial for the Pfizer vaccine – Study to Describe the Safety, Tolerability, Immunogenicity, and Efficacy of RNA Vaccine Candidates Against COVID-19 in Healthy Individuals – is May 2, 2023.  The product status for all doses and ages in this clinical study is deemed "Experimental."

Moderna

142.   The Moderna vaccine for COVID-19 was authorized for emergency use by the FDA on December 18, 2020.

143.   Pursuant to FDA's emergency use authorization, Moderna is required to submit periodic safety reports to the FDA which are not disclosed to the public.

144.   FDA's correspondence to Moderna dated July 7, 2021 describes the Moderna vaccine as follows: "It is an investigational vaccine not licensed for any indication."

145.   The EUA Fact Sheet for Recipients and Caregivers of the Moderna vaccine states, "There is no U.S. Food and Drug Administration (FDA) approved vaccine to prevent COVID-19" . . . "It is your choice to receive the Moderna COVID-19 vaccine."

146.   Presently, the estimated completion date for the ongoing clinical trial for the Moderna vaccine – Study to Describe the Safety, Tolerability, Immunogenicity, and Efficacy of mRNA-12273 Vaccine in Adults Aged 18 Years and Older to Prevent COVID-19 – is October 22, 2022.  The product status for all doses and ages in this clinical study is deemed "Experimental: mRNA-1273."

<u>Johnson & Johnson</u>

147.   The Johnson & Johnson vaccine for COVID-19 was authorized for emergency use by the FDA on February 27, 2021.

148.   Pursuant to FDA's emergency use authorization, Johnson & Johnson is required to submit periodic safety reports to the FDA which are not disclosed to the public.

149.    FDA's correspondence to Janssen Biotech, Inc. dated June 10, 2021, describes the Johnson & Johnson vaccine as follows: "It is an investigational vaccine not licensed for any indication."

150.    The EUA Fact Sheet for Recipients and Caregivers of the Moderna vaccine states, "There is no U.S. Food and Drug Administration (FDA) approved vaccine to prevent COVID-19" . . . "It is your choice to receive the Janssen COVID-19 vaccine."

151.    Presently, the estimated completion date for the ongoing clinical trial for the Janssen vaccine – Study of Ad26.COV2.S for the Prevention of SARS-CoV-2 Mediated COVID-19 in Adult Participants – is January 2, 2023.  The product status for all doses and ages in this clinical study is deemed "Experimental: Ad.26.COV2.S".

152.    Defendants have not taken any of these matters into consideration in mandating their Policy.

<u>Evolving Scientific Knowledge</u>

153.    COVID-19 vaccines are under investigation and shall remain so for several years according to ongoing clinical studies.

154.    The long-term safety and efficacy of all COVID-19 vaccines remains completely unknown because these are completely new products that have only been tested on limited groups of people for a limited period of time.

55

155.   Most recently, a Pfizer Biodistribution Study obtained by Dr. Byram

Bridle, MD, a viral immunologist, (through Japan's equivalent of a public records

request) showed lipid nanoparticles from the vaccine did not stay in the deltoid

muscle where they were injected, as the vaccine's developers claimed would

happen, but circulated throughout the body and accumulated in large

concentrations in organs and tissues, including the spleen, bone marrow, liver,

adrenal glands and — in "quite high concentrations" — in the ovaries.[22]

156.   The Pfizer Biodistribution Study, which upon information and belief

may also be in the possession of the FDA, reveals the various organs and tissues of

the body where the Pfizer vaccine was detected following vaccination.[23]

157.   The latest data from Israel and the United Kingdom suggest that

COVID-19 vaccine-induced immunity is waning rapidly in those countries.[24]

---

[22] *See* Children's Health Defense Team, *Watch 1-Hour Version of Censored Interview with Inventor of mRNA Vaccine Technology*, The Defender (July 8, 2021) available at https://childrenshealthdefense.org/defender/censored-dark-horse-podcast-bret-weinstein-robert-malone-inventor-mrna-vaccine-technology/ .

[23] Megan Redshaw, *'We Made a Big Mistake' — COVID Vaccine Spike Protein Travels From Injection Site, Can Cause Organ Damage*, The Defender (June 3, 2021) available at https://childrenshealthdefense.org/defender/covid-vaccine-spike-protein-travels-from-injection-site-organ-damage/

[24] Nathan Jeffay, *Israeli, UK data offer mixed signals on vaccine's potency against Delta strain*, The Times of Israel (July 22, 2021) available at https://www.timesofisrael.com/israeli-uk-data-offer-mixed-signals-on-vaccines-potency-against-delta-strain/; Ian Sample, *Scientists back Covid boosters as study finds post-jab falls in antibodies*, The Guardian (July 22, 2021)

158.   Pfizer has already received authorization for a booster shot to its COVID-19 vaccine for certain groups.[25]

159.   Epidemic spread of COVID-19, like all other respiratory viruses, is driven by symptomatic persons who can self-isolate or quarantine from the general population.  Asymptomatic spread is trivial and inconsequential.  According to a meta-analysis of contact tracing studies published in the *Journal of the American Medical Association*, asymptomatic COVID-19 spread was only 0.7%.[26]

160.   A rational and ethical prevention measure to reduce the spread of COVID-19 is a simple requirement, as part of formal policies, that persons with active symptomatic, febrile (feverish) respiratory illnesses, like COVID, should isolate themselves.  Defendants did not take this into consideration when they issued their COVID-19 vaccine mandate.

---

https://www.theguardian.com/world/2021/jul/22/uk-scientists-back-covid-boosters-as-study-finds-post-jab-falls-in-antibodies

[25] Michael Erman, Julie Steenhuysen, *Pfizer, BioNTech to seek authorization for COVID booster shot as Delta variant spreads,* Reuters.com (July 9, 2021), available at https://www.reuters.com/business/healthcare-pharmaceuticals/pfizer-ask-fda-authorize-booster-dose-covid-vaccine-delta-variant-spreads-2021-07-08/

[26] *See* Zachary J. Madewell, PhD; Yang Yang PhD; Ira M. Longini Jr, PhD; Elizabeth Halloran, MD, DSc; Natalie R. Dean, PhD; *Household Transmission of SARS-CoV-2: A Systematic Review and Meta-analysis,* JAMA Network Open available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774102 .

161.   Additionally, there is now strong evidence that persons who have been infected with SARS-CoV-2 and recovered from COVID-19 are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being proposed.[27] Individuals who have recovered from a prior infection of COVID-19 have a negligible risk of reinfection.  The full extent of natural immunity includes antibodies, B-cells, plasma cells, T-helper cells, T-presenting cells, natural killer cells, and a host of innate defenses against the virus.  Natural immunity is robust, durable, and complete against all strains of SARS-CoV-2.  If there was any significant risk of reinfection, there would be millions of such cases by this time.

162.   More recently, medical professionals have begun to raise concerns that vaccinating those recently infected can lead to serious injury or death by causing antigen-specific tissue inflammation in any tissues harboring viral antigens.[28]

---

[27] *See* Yair Goldberg; Micha Mandel, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three month nationwide experience from Israel*, medRxiv (April 20, 2021) available at https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 .  *See also* Jackson S. Turner; Wooseob Kim, et al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans,* Nature 595 (pp. 421-425) (May 24, 2021)

[28] *See* Hooman Noorchashm, MD, *An Urgent Warning to Rutgers University: On a Potential Safety Hazard and Liability in Your COVID-19 Vaccine Mandate* (March 25, 2021) available at https://noorchashm.medium.com/an-urgent-warning-to-

163.   SARS-CoV-2 causes infection in humans that results in robust, complete, and durable immunity.

164.   Natural immunity is superior to vaccine-induced immunity.

165.   Epidemiological studies have demonstrated to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2 virus provides robust and durable protection against reinfection, at levels equal to or better than the *most effective* vaccines currently available.[29]

166.   It is medically unnecessary for persons who have recovered from COVID-19 and present evidence of natural immunity to undergo vaccination for SARS-CoV-2. Coercing such persons to do so would subject them to an elevated risk of adverse side effects.

167.   Defendants have not taken any of these matters into consideration in mandating their Policy.

---

rutgers-university-on-a-potential-safety-liability-in-your-covid-19-vaccine-82e10e1e1fb .

[29] *See e.g.* N. Kojima; A. Roshani, et al., *Incidence of Severe Acute Respiratory Syndrome Coronavirus-2 Infection among previously infected or vaccinated employees,* medRxiv (July 3, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.03.21259976v2 .

*Rutgers' Unlawful Policy*

168.   Rutgers, The State University of New Jersey ("Rutgers"), is requiring every student returning on campus in the Fall of 2021 to take one of these experimental vaccines even though there is no longer a state of emergency in New Jersey, no local or state health department requires them, the Governor and State Legislature have not ordered them, and neither the FDA, Congress or even the President mandates their use in any context, and alternatives to vaccination exist to monitor, prevent and treat COVID-19 effectively.  Notably, Rutgers is not requiring the administration, faculty, or staff to get the jab – they get to keep their medical freedom. "Rules for thee and not for me" made manifest.

169.   Rutgers did not always intend to mandate vaccines to students.  In January 2021, Rutgers announced that it would not require COVID-19 vaccines for students to return to campus for in-person instruction; plaintiffs relied on this representation to accept admission or avoid seeking transfers to other institutions.

170.   Specifically, on or about January 22, 2021, Rutgers told the public and the student body that it would not mandate COVID-19 vaccination for students to return to campus for in-person instruction because it valued medical freedom.  In a video sent to students and staff, Rutgers Biomedical and Health Sciences Senior Vice Chancellor Vicente Gracias assured viewers that Rutgers would not mandate COVID-19 vaccines based upon a history and tradition at the University of

promoting human liberty.  Vice Chancellor Gracias emphasized that education

would serve as the driver for vaccination at Rutgers, not coercion, and that the

University could rotate in-person schedules or attendance as an added safety

measure to welcome students back to campus for in-person instruction.

171.   Certain Plaintiffs relied on Rutgers' representation that it would not

mandate COVID-19 vaccines in order to accept offers of admission to its colleges,

avoid seeking transfers to other colleges and universities, or entertain other

alternatives to in-person attendance.

172.   Two months later, however, as COVID-19 rates decreased and as the

State of New Jersey began to end the state of emergency, and with no reported

outbreak at the University, Rutgers reneged.  It was not in Rutgers' financial

interest to allow students to return without a COVID-19 vaccine mandate.  Upon

information and belief, Rutgers was influenced by its close association with

COVID-19 vaccine manufacturers to adopt this reversal. Rutgers became the first

university in the nation to require COVID-19 vaccines of all students returning for

in-person instruction, reversing its earlier commitment not to do so

173.   On March 25, 2021, in a message posted on Rutgers' website,

President and University Professor Jonathan Holloway announced that the

university was "updating its Immunization Requirements for Students to include

the COVID-19 vaccine."  According to President Holloway, "[t]his health policy

update means that, with limited exceptions, all students planning to attend in the Fall 2021 semester must be fully vaccinated" and "[p]roof of vaccination will be required for all students planning to attend this fall."  Notably, President Holloway's message excluded Rutgers faculty and staff from this requirement.

174.   On March 26, 2021, on behalf of the Plaintiffs and others similarly situated, Robert F. Kennedy, Jr, Founder, Chairman of the Board and Chief Litigation Counsel for Children's Health Defense, wrote a letter to Jonathan Holloway, President of Rutgers, asking him to reconsider mandating COVID-19 vaccines to returning students on the basis of federal constitutional and statutory requirements.[30]  Defendants ignored this letter.

175.   Nevertheless, on April 13, 2021, Rutgers formally adopted policy section 10.3.14 entitled, "Interim COVID-19 Immunization Record Requirement for Students" (the "Policy"), which details the COVID-19 immunization record requirements for all Rutgers University students.  The Policy requires all students to present evidence of COVID-19 immunization with one of the currently emergency-use authorized COVID-19 vaccines "at least 2 weeks prior to coming onto campus for any reason, including but not limited to moving into a residence

---

[30] Children's Health Defense Team, *RFK, Jr. to Rutgers President: COVID Vaccine Mandate Violates Federal Law, The Defender* (March 29, 2021), available at https://childrenshealthdefense.org/defender/rfk-jr-rutgers-covid-vaccine-mandates-violate-federal-law/ .

hall, attending campus classes, and/or entering any campus building." Students are required to upload evidence of immunization to the Rutgers Immunization Portal prior to arrival on campus.

176.   There is no penalty or sanction provision expressed in the Policy for a student's failure to submit evidence of COVID-19 immunization other than, presumably, the privilege of attending in-person. The Policy does not state that students will be disenrolled if they do not comply, excluded from any program, or blocked from accessing their NetID Rutgers online my.rutgers.edu accounts. Nevertheless, Rutgers has begun to penalize, sanction and exclude students for noncompliance.

177.   Rutgers did not express any explanation or justification for its reversal on a COVID-19 vaccine mandate between January and April, 2021, and has never offered one; nor did it provide any explanation for the exclusion of faculty and staff from this requirement. Upon information and belief, Rutgers could not mandate faculty and staff to get vaccinated for COVID-19 without causing a revolt among the faculty or the loss of esteemed professors who will not be coerced to subject themselves to an experimental vaccine under any circumstances.

178.   Following announcement of its Policy, Rutgers received financial benefits from vaccine manufacturers, including but not limited to being selected as

a clinical trial site for the global Pfizer-BioNTech research study to evaluate the efficacy of its COVID-19 vaccine in children aged 6 months to 11 years.

179.   The right to informed consent is one of the most fundamental rights guaranteed by the Constitution of the United States and the Constitution of the State of New Jersey – it entitles every person the right to refuse medical treatment; the right also entitles every person to information as is reasonably necessary to make an informed decision to accept or reject proposed treatment, as well as a reasonable explanation of viable alternative treatments or interventions.

180.   But Rutgers, which is working with all three COVID-19 vaccine manufacturers, Pfizer, Moderna and Johnson & Johnson, to develop these vaccines, is financially invested in promoting their use on as many people as possible, regardless of the consequences, since manufacturers and healthcare providers have no liability if a vaccine causes injury or death.

181.   Rutgers benefits financially from working with COVID-19 vaccine manufacturers and upon information and belief stands to gain from potential intellectual property rights, patents and/or the eventual approval, licensing and marketing of these experimental vaccines; the more people in the United States and around the world are required to take these vaccines, the more financial rewards Rutgers and its partners are likely to reap.  Not surprisingly, neither the manufacturers nor Rutgers have volunteered to donate their intellectual property to

the world in order to supposedly to save the human race, even though the governments of the world could easily compensate them for their investments to date.

182.   Rutgers is requiring all students to face the unknown risks of emergency-use authorized vaccines that are still under investigation and that it is helping to develop, without regard for the death or injury that these vaccines could cause.  Rutgers is certainly not volunteering to compensate anyone if a student is harmed or injured by a COVID-19 vaccine as a result of adhering to its Policy. Nor is any vaccine manufacturer so willing.

183.   Rutgers' Policy constitutes an assault on basic principles of liberty, privacy and bodily integrity guaranteed by the U.S. Constitution and the Constitution of the State of New Jersey.  The Policy violates the right to informed consent and to refuse unwanted medical treatment and to bodily integrity guaranteed by the Fourteenth Amendment and Article 1 of New Jersey's Constitution.  COVID-19 vaccines are not required by any local, state or federal health authority, and in fact Rutgers' policy contradicts the action that the federal and state governments are presently authorized to take concerning emergency-use authorized biologics, even in the face of a pandemic, and so is preempted by federal law and *ultra vires* under state law.

184.   Rutgers was one of the first to set a new precedent: that any college or university, indeed any employer or institution, can mandate and coerce its students and employees to submit to medical interventions it alone deems "necessary," regardless of efficacy, regardless of safety, and regardless of risk without any express mandate from the President, the Governor, any legislative body, any State Board of Health or any public health authority.  Its policy was among the first to set the precedent that any institution can mandate any medical intervention as a prerequisite to attendance or employment.  As this policy is mimicked around the country, it has the potential for creating a patchwork of competing requirements throughout the state and the nation.

185.   If Rutgers' Policy is not deemed unlawful, colleges and universities could potentially order their students to subject themselves to any other medical intervention, such as monoclonal antibody infusions or oral medicines, as a condition of attendance.  No university, especially Rutgers, has the legal authority, knowledge, or objectivity to order any medical treatment on its students, including immunization, especially since no university is accountable to the people.

186.   Rutgers' Policy is not only federally preempted or void under state law, it also fails to meet many of the requirements established by the U.S. Supreme in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), for compulsory vaccination: (1) it was not passed by any legislative body or mandated by any health authority; (2)

it is unnecessary because an emergency no longer exists in the State of New Jersey; rates have decreased naturally, and alternatives to vaccination exist and have been shown to work; (3) it is not a reasonable means of addressing the spread of COVID-19 because these vaccines have not been designed or shown to prevent infection or transmission of Sars-CoV-2; (4) it is not proportionate to the risk of the disease, because the unknown risks of these experimental COVID-19 vaccines outweigh the known risks of COVID-19 morbidity and mortality, especially among the targeted population: college-aged students, in this case who have a very low chance of suffering any severe impact or death from the disease; (5) it discriminates, because the policy fails to comply with the current state law requirement to exempt students who have recovered from COVID-19 and have achieved and can demonstrate natural immunity (a greater level of immunity), so it is *overbroad*, discriminatory and violates current state law; it also fails to include all faculty and staff at the university, and so it is *underinclusive*; and it subjects students who are granted religious and medical exemptions to discriminatory treatment that has not been shown necessary or proven to prevent the spread of COVID-19, namely mask wearing and exclusions from dormitories; and (6) the Policy, as applied, fails to allow for medical and religious exemptions in a reasonable manner, since the criteria being used to grant or deny these exemptions is not expressed in the Policy or transparent or otherwise subject to public scrutiny;

and has led to arbitrary and capricious denials or non-responses to medical

exemption and religious exemption requests to Plaintiffs.  Finally, Rutgers has

applied its Policy arbitrarily and capriciously, with the intent of misleading and

confusing the student body, with communications intended to harass, alarm, coerce

and compel students to vaccinate against their will.

187.   Rutgers' Policy purports to accept medical and religious exemptions

to its COVID-19 vaccine requirement, but these requests are being arbitrarily and

capriciously denied to students with valid reasons; students who previously had

submitted religious exemptions to other vaccines are being asked to resubmit

statements to this one; students' statements that vaccination generally, or COVID-

19 vaccines specifically, conflict with their religious beliefs are being assessed

arbitrarily without any public criteria; students' statements of medical

contraindication supported by doctors' notes are being denied arbitrarily.

188.   Finally, when Rutgers grants an exemption, it then discriminates

against students who are given a medical accommodation or allowed to exercise

religious freedom by forcing them to wear ineffective emergency-use authorized

masks or facial coverings, and by barring them from residing in dormitories (which

subjects them to the loss of scholarships, Honors Program enrollments, athletics),

and potentially other social and academic activities.  Rutgers intends to stigmatize

students who must exercise caution to avoid a known medical risk, or, who exercise a religious objection, rendering them outcasts on campus.

189.   Moreover, between January and April, 2021, rates of infection and hospitalization for COVID-19 generally declined in New Jersey and throughout the country, and local, state and federal officials continued to gradually relax COVID-19 related restrictions and requirements everywhere.

190.   Upon information and belief there has never been a significant outbreak of COVID-19 that can be traced to Rutgers University, or any material increase in the rate of COVID-19 infection among the Rutgers student body.

191.   The Policy exempts the following students from its requirement: (A) students whose entire course of study is web-based, a fully online degree program and/*or fully remote* and have no physical presence on campus (emphasis added); (B) students participating in fully online or off-campus Continuing Education Programs.  The Policy also allows the following students to be considered for an exemption: (C) students with a medical contraindication for COVID-19; and (D) students with a religious objection to vaccination.  In order to qualify for a medical or religious exemption, the student's failure to receive immunization cannot prevent fulfillment of the essential functions and/or curricular requirements of the academic program.

192.   Students claiming a medical contraindication and seeking a medical exemption under the Policy must upload for review "a written statement from a healthcare provider licensed to practice medicine in the United States or a foreign country stating that a specific immunization is medically contraindicated, and giving the reasons for and duration of this contraindication to the Rutgers Immunization Portal for review."  The Policy does not identify who will conduct review of a student's medical contraindication statement, the criteria for conducting such a review, or explain how such review will be conducted other than stating "[c]onditions comprising valid medical contraindications to vaccine administration are those set forth by the Centers for Disease Control and Prevention."  Such conditions are subject to change since the COVID-19 vaccines are still under investigation.

193.   Students seeking a religious exemption under the Policy must upload for review a written signed statement explaining how immunization conflicts with the student's bona fide religious beliefs or practices.  The Policy does not identify who will assess the validity, genuineness or sufficiency of a student's religious beliefs, the criteria for conducting such a review or explain how such a review will be conducted other than stating, "[a] general philosophical or moral objection to immunization shall not suffice as the basis for exemption on religious grounds."

194.   In practice, Rutgers is arbitrarily and capriciously rejecting students' medical and religious exemption requests.  Rutgers has refused to grant an exemption to students who have a medical contraindication, such as Plaintiff Raelynne Miller, who has submitted such requests multiple times, supported by documentation from doctors.  At least one Plaintiff who had previously submitted a religious exemption to vaccination was asked to resubmit a religious exemption; other students are being asked to "clarify" their religious statements without any explanation or criteria, and Rutgers has denied religious exemptions without particular explanation.

195.   Additionally, in violation of the express terms of its Policy, Rutgers demanded that students submit evidence of vaccination ***before*** the Policy deadline and threatened to revoke access to their Rutgers on-line accounts, university housing and other privileges if they failed to do so.

196.   Rutgers also issued message blasts to the student body that misstated the Policy and its requirements.

197.   For example, the Policy expressly states that students whose entire course of study is . . . fully remote are exempt from its requirements.  Nevertheless, in one message blast, dated on or about July 20, 2021, Rutgers told students that this exemption only applies to students enrolled in an online degree program, and anyone who did not comply would be prevented from continuing his or her

academic work at Rutgers.  As a result, students who specifically selected a fully-remote schedule are not exempt from the mandate, as the Policy permits.  Rutgers is applying its own policy arbitrarily and capriciously.

198.   In a second message blast sent to students on or about July 21, 2021, Rutgers alerted students that they were already noncompliant with the Policy before the deadline had elapsed.  This message, entitled "ACTION REQUIRED" in bold, red letters, was intentionally designed to alarm and confuse students who received it.  It was sent to all students, including those who had already been granted an exemption, and it required a student to select a limited set of options (with no reference to medical or religious exemptions) in order to maintain access to Rutgers computer applications or online accounts.  Students like Plaintiff Peter Cordi, who is enrolled in summer coursework, were temporarily blocked from Rutgers' computer accounts, jeopardizing the timely submission of assignments, and thus further coerced to make selections they did not agree with.

199.   Rutgers' Policy and its administration of the Policy demonstrate how cavalierly Rutgers is treating this matter.  Rutgers is failing to adequately inform administration and staff how to implement the Policy, especially concerning athletics.  Administration and athletic directors are receiving conflicting information and unable to communicate to students and to their families the consequences of the Policy, or the effect that granting medical or religious

exemptions or exclusions from university housing will have on a student's ability to participate in athletics, in specialized programs or maintain scholarships.

200.   Such conduct is evidence that Rutgers is engaged in a callous campaign to arbitrarily and capriciously deviate from its own Policy in its communications with the student body, and confuse and confound students and parents, in order to intimidate, wear down and coerce students to vaccinate against their will without regard for their rights under the Policy or under the law.

201.   Furthermore, Rutgers is not providing any medical or financial support to any student or their family if they experience an adverse event to an emergency-use authorized COVID-19 vaccine, even if such student is unable to attend school for days, weeks, or months, or if the student is disabled or dies.

202.   Rutgers is unwilling to accept liability if a student suffers an adverse effect, or is disabled, otherwise injured or dies after receiving a COVID-19 vaccine to comply with Rutgers' Policy.

203.   Rutgers did not review and consider the evidence of material adverse events reported to date for people who have received experimental COVID-19 injections when it decided to adopt its Policy.

204.   Rutgers did not consider or attempt to institute and administer less intrusive alternatives to its Policy, such as mandatory periodic COVID-19 testing,

staggered scheduling, social distancing, prophylactic recommendations to the student body or other measures in lieu of its COVID-19 mandate.

205.   During the summer of 2021, Rutgers instituted policies of regular testing for students on campus in athletics and other programs with success and reported no outbreaks of material significance on campus.

206.   Rutgers did not consider continuing a policy of regular testing of all students on campus or a policy permitting students to test or self-test for COVID-19 on a regular basis in lieu of vaccination.

207.   Rutgers did not consider as another alternative instituting a policy that required any student with active symptomatic, febrile (feverish) respiratory illness to self-isolate in lieu of immunization.

208.   Additionally, Rutgers administers COVID-19 vaccines to students and the public on campus.  When doing so, Rutgers employs a COVID-19 Immunization Screening and Consent Form.  Rutgers' Form states that the vaccine being offered "has not completed the same type of review as an FDA-approved or cleared product."  It directs recipients to read the EUA Fact Sheet for the three vaccines available and to consent to the administration of the vaccine in writing. Rutgers' Form reads:

> I understand that I have the option to accept or refuse administration of the vaccine, of the consequences of refusing administration of the vaccine, and of the

alternatives to the vaccine that are available and of the
risks and benefits of those alternatives, if any.

209.   Defendants act in conflict with these EUA Fact Sheets and federal law

when they threaten to prevent students from continuing their studies for exercising

the option to accept or refuse administration of the vaccine.

210.   Students enrolled at Rutgers do not possess the same medical freedom

as persons participating in Rutgers' COVID-19 clinical trials.

211.   There is little to no risk for serious harm or hospitalization from

COVID-19 among college age students.  Even during high frequency of COVID-

19 cases, as determined by standard testing, serious COVID-19 cases among

college and graduate students are rare events.  Rutgers did not consider this fact

when it adopted its Policy.

212.   College students are not the spreaders of Sars-CoV-2 to the

community.  A recent study reported the results of a longitudinal serosurvey (blood

sampling) of community residents in Centre County, Pennsylvania, home to

Pennsylvania State University and University Park Campus, and concluded there

was limited transmission between students who arrived on campus last fall and the

surrounding community and the "demographic shift associated with student return

to campus was not associated with SARS-CoV-2 seroprevalence in the cohort of

community residents."[31]  Rutgers did not consider this study when it adopted its Policy.

213.   The current risks of serious adverse events or deaths from COVID-19 vaccines outweigh their benefits, and existing, approved drugs provide highly effective prophylaxis and treatment against COVID.

214.   Assuming *arguendo* that Rutgers' policy somehow meets the requirements of *Jacobson v. Massachusetts, supra,* that case was decided over 100 years ago, in a completely different context, before the Supreme Court established tiers of constitutional scrutiny, before Congress granted vaccine manufacturers immunity from liability, before federal and state health agencies and their officials, medical schools and universities, were captured by the pharmaceutical industry, and before emergency-use authorized biologics were even contemplated or the novel technologies employed by the currently authorized vaccines could be dreamed of.  *Jacobson* does not stand for the proposition that any entity may order compulsory immunization with an experimental vaccine anywhere it so chooses.

---

[31] *See* Callum R.K. Arnold; Sreenidhi Srinivasan; Catherine M. Herzog; Abhinay Gontu; Nita Bharti; Meg Small; Connie J. Rogers; Margeaux M. Schade; Suresh V. Kuchipudi; Vivek Kapur; Andrew Read; Mattew J. Ferrari, *SARS-CoV-2 Seroprevalence in a University Community: A Longitudinal Study of the Impact of Student Return to Campus on Infection Risk Among Community Members*, medRXiv (Feb 19., 2021), available at https://pubmed.ncbi.nlm.nih.gov/33619497/ (last visited August 4, 2021).

Whether, to what extent, and with what force *Jacobson* applies at all in the current political, social and legal context concerning an *experimental* vaccine with unknown risks is open to legitimate question.  Plaintiffs contend that their attendance at Rutgers cannot be revoked or circumscribed because they are exercising their constitutional right to refuse unwanted medical treatment, on the basis of informed consent, a particular medical risk to them, or religious conviction and that the *Jacobson* case renders Rutgers' Policy unconstitutional.

215.   Rutgers' Policy of coercion and intimidation violates a student's right to refuse unwanted medical treatment under the Fourteenth Amendment by denying students the benefit of attending Rutgers because they choose to exercise their constitutional right to refuse injection with an experimental vaccine.  This unlawful Policy was adopted by a university that appears to be motivated more by greed than public health because it reversed course to mandate this policy when rates of infections were dropping and the public health emergency was subsiding. If Rutgers is not stopped, and its Policy declared unlawful, every university, college or school, and every employer in the nation will believe it can either initiate or continue policies to coerce their students and employees to undertake whatever medical interventions or treatments they alone deem necessary regardless of any health authority or legislative mandate, and they may essentially deprive persons who choose to exercise their constitutional rights of an education,

employment and other societal benefits and privileges.  A person's pursuit of life, liberty and happiness, pursuit of education and career, vocation, participation in the marketplace of ideas and in commerce, and their exercise of public privileges and duties of citizenship cannot be conditioned on the abandonment of a constitutional right.  Coerced submission to experimental medical intervention in the face of unknown risks is a violation of the right to refuse medical treatment, especially when experimental emergency-use medical substances are mandated by those who have financial 'skin in the game' and stand to profit from such a mandate, as Rutgers does.

216.   Beyond being preempted by federal law and unauthorized by state law, and constituting a violation of students' fundamental rights to informed consent and to refuse medical treatment, this Policy also constitutes a breach of contract between Rutgers and its students.  Rutgers entered into a contract with its students to provide college education in exchange for payment of tuition; Rutgers is unilaterally altering the terms of that agreement with no consideration. Rutgers should also be collaterally estopped from reversing its stated position that it would not require COVID-19 vaccines.  Relying on this statement, Plaintiffs and their families made major financial commitments to the university that they would not otherwise have made but for Rutgers' Policy against a mandate.

*Alternatives to Experimental Immunization*

217.   There are now well-studied, safe and reliable alternatives to vaccination to prevent and treat COVID-19, including, but not limited to, Ivermectin, Methylprednisolone, Fluvoxamine, Hydroxychloroquine, Vitamin C, Vitamin D3, Zinc, Melatonin, Aspirin, corticosteroids and other accessible therapies. Randomized-controlled trials and observations by front line medical practitioners have confirmed that COVID-19 is preventable and treatable, especially at early onset with medicines and practices that have proved safe for decades.  As a result, the pandemic can end now without vaccines – based upon current scientific knowledge and understanding.  Vaccines are not necessary to defeat COVID-19.  Defendants did not take this into consideration in issuing their mandate.

218.   The treatment for COVID-19 infection has improved tremendously since its advent.  Studies have shown several different treatment methods which have proven safe and effective.  For example, a combination of medications, supported by the Association of American Physicians and Surgeons, for a minimum of five days and acutely administered supplements used for the initial ambulatory patient with suspected and confirmed COVID-19 (moderate or greater

probability) has proven effective.[32]  Defendants did not take this into consideration in issuing their mandate.

219.   More significantly, FLCCC has developed the most comprehensive prevention and treatment protocols for COVID-19 to date.[33]  This organization is composed of some of the most well-established and published doctors in the world, who are treating patients in hospitals.  In particular, they are best known for their evaluation, use and championing of Ivermectin as a solution to end the COVID-19 pandemic based on numerous scientific studies demonstrating its dramatic prophylactic and treatment capabilities.[34]  Defendants did not take this into consideration in issuing their mandate.

---

[32] *See* Brian C. Procter; Casey Ross; Vanessa Pickard; Erica Smith; Cortney Hanson; Peter A. McCullough, *Clinical outcomes after early ambulatory multidrug therapy for high risk SARS-CoV-2 (COVID 19) infection,* Reviews in Cardiovascular Medicine (December 30, 2020), available at https://rcm.imrpress.com/EN/10.31083/j.rcm.2020.04.260 (last visited on August 4, 2021).

[33] *See* FLCCC's prevention and treatment protocols for COVID-19 available at https://covid19criticalcare.com/covid-19-protocols/ .

[34] *See* Kory, Pierre MD; Meduri, Gianfranco Umberto MD; Varon, Joseph MD; Iglesias, Jose DO; Marik, Paul E.  MD, *Review of the Emerging Evidence Demonstrating the Efficacy of Ivermectin in the Prophylaxis and Treatment of COVID-19,* American Journal of Therapeutics (May/June 2021) available at *https://journals.lww.com/americantherapeutics/Fulltext/2021/06000/Review_of_the_Emerging_Evidence_Demonstrating_the.4.aspx* (last visited on August 4, 2021).

220.   Ivermectin has been used over-the-counter for COVID in many countries and regions with excellent reported treatment success.  The drug's safety has been established with at least a billion doses used, and the drug is on the World Health Organization's list of essential drugs.

221.   Many medical professionals suspect FDA's feigned ignorance about Ivermectin was a prerequisite to issuing EUAs for COVID vaccines, given the EUA requirement that no approved drug may be available for the same indication. Ivermectin and hydroxychloroquine, both of which have extremely long biological half lives, can be given infrequently as prophylaxis for COVID.

222.   Hydroxychloroquine, chloroquine, or Ivermectin have been used weekly to prevent COVID.  Many clinical trials have documented the benefits of both drugs for COVID prevention.  Yet FDA has remained silent about these benefits, even though the efficacy of these preventive treatments probably supercedes that of COVID vaccines.

223.   Defendants have innumerable options available to them to protect the health and safety of their students and the Rutgers community that do not involve coercion of an experimental vaccine. For example, Defendants employed periodic testing successfully to prevent any outbreaks during the summer. Defendants also intended to employ staggered schedules, social distancing and other measures to enable students to return to campus without coerced vaccination.  Yet Defendants

have not attempted or considered such countermeasures for students returning in the Fall of 2021.  Instead, Defendants have elected to coerce, harass, and intimidate students who do not want to take these vaccines.  Defendants have elected to sanction students, who have the courage to exercise their civil right to informed consent and to refuse medical treatment.

## FIRST CLAIM FOR RELIEF
### (Preempted by Federal Law and *Ultra Vires* under State Law)

224.   Plaintiffs repeat and reallege the allegations hereabove as if fully set forth herein.

225.   The Supremacy Clause establishes that federal law "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., Art. VI, cl. 2.

226.   Where state and federal law directly conflict, state law must give way.

227.   State law is naturally preempted to the extent of any conflict with a federal statute.

228.   State and federal law conflict where it is impossible for a private party to comply with both state and federal requirements.

229.   The Supremacy Clause requires that federal requirements for informed consent supersede state laws and regulations that conflict with EUA provisions.

230.   Rutgers' COVID-19 Immunization Policy is preempted by the Food,

Drug and Cosmetic Act, 21 U.S.C. § 301, *et seq.*, specifically, 21 U.S.C. §360bbb-3, entitled "Authorization for medical products for use in emergencies" because it conflicts with the requirements of that statute.

231.   Congress enacted, and from time to time has amended, the Food, Drug and Cosmetic Act, in part, to occupy the field concerning the approval, licensure, and administration of vaccines, especially vaccines authorized for emergency-use.

232.   Pursuant to federal law, only the Secretary of Health and Human Services is authorized to introduce into interstate commerce, during a declaration of emergency, a biological product, which includes vaccines, intended for use in an actual or potential emergency under the specific requirements set forth in 21 U.S.C. §360bbb-3.

233.   Only the Secretary is authorized by federal law to establish the conditions and requirements for the administration of emergency-use authorized biologics.

234.   21 U.S.C. § 360bbb-3 sets forth the "required conditions" for unapproved vaccines that are authorized for emergency use.  These "required conditions" apply to "a person who carries out any activity for which the authorization is issued," including Defendants.

235.   As a condition of emergency-use authorization, the Secretary is required to establish "appropriate conditions designed to ensure that individuals to

whom the product is administered are informed" of, *inter alia*, "the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks."  21 U.S.C. § 360bbb-3.

236.   The Secretary has established such appropriate conditions concerning the currently available COVID-19 vaccines, consistent with federal law, by not mandating COVID-19 vaccines and requiring the use of EUA Fact Sheets that must be given to caregivers and recipients of COVID-19 vaccines, informing them of their right to accept or refuse administration of the vaccine.

237.   Moreover, federal law specifically deprives the Secretary of the power to mandate emergency-use authorized treatments, devices, or biologics of any kind, including vaccines, since the law specifically requires the Secretary to establish conditions to ensure that individuals to whom the product is administered are informed of the option to accept or refuse vaccination.  21 U.S.C. § 360bbb-3.

238.   Congress passed the Food, Drug and Cosmetic Act generally, and § 360bbb-3 in particular, to occupy the field of emergency-use authorized vaccine approval and vaccine administration procedures, to set forth all required conditions for such use, and to preempt the States from approving vaccines affecting interstate commerce for emergency use on their own, and from deviating or contradicting its regulations and guidance concerning vaccines.

239.   Additionally, preemption is implied where there is actual conflict between federal and state law concerning vaccines.

240.   Rutgers' Policy conflicts with or fails to comply with the appropriate conditions established by the Secretary and the FDA for the administration of COVID-19 emergency-use authorized vaccines.

241.   Rutgers' Policy does not give students "the option to accept or refuse administration" of COVID-19 vaccines without subjecting them to sanctions, such as exclusion from in-person classes, exclusion from university housing, exclusion from certain academic and athletic programs, exclusion from academic studies or Honors Programs, exclusion from NetID access to my.rutgers.edu electronic accounts, and possibly disenrollment or expulsion.  As a result, Rutgers' Policy punishes students for exercising their right under 21 U.S.C. § 360bbb-3, the Fourteenth Amendment and Article 1 of the Constitution of the State of New Jersey to informed consent, refuse medical treatment, to bodily integrity and medical freedom.

242.   Rutgers is not authorized to alter, amend, deviate or conflict with any of the conditions established by the Secretary for the use and administration of emergency-use authorized biologics.  Rutgers' Policy conflicts with the Secretary's orders and directives for the use and administration of emergency-use authorized biologics by coercing its students to waive their constitutional rights to informed

consent, to refuse medical treatment and to subject themselves to immunization

with a vaccine that is still under investigation and otherwise experimental in order

to continue to attend Rutgers.

243.   Additionally, in New Jersey, the State Legislature and the Governor,

by statute, establish requirements for immunization in public and private

institutions of higher learning, including which vaccines are mandatory for

attendance, which records colleges and universities are mandatory as evidence of

immunization or immunity from disease, and what information colleges and

universities track and report to the State are mandatory.  Board of Health

regulations elaborate upon and establish methods for compliance with state

statutes.

244.   Only the Commissioner of New Jersey's Department of Health and

Senior Services and local health officers are authorized by law to modify

immunization requirements in response to an outbreak or threatened outbreak.

N.J.A.C. 8:57-6.21.

245.   No state statute authorizes Rutgers, or any other public or private

institution of higher learning, to require students to demonstrate COVID-19

vaccination as a condition of attendance.

246.   No state regulation from the NJ DOH authorizes Rutgers, or any other

public or private institution of higher learning, to require students to demonstrate

COVID-19 vaccination as a condition of attendance.

247.   Absent any enabling statute or rule, Rutgers is not authorized to require novel vaccines, particularly for currently unapproved vaccines, especially now that the State has declared, by law, that no public health emergency exists in the State of New Jersey.

248.   Absent any State enabling statute or rule, Rutgers Policy violates the requirements set forth in *Jacobson v. Massachusetts* for compulsory immunization.

249.   Moreover, state law specifically permits students to present, and requires Rutgers to accept, evidence of immunity from disease in lieu of vaccination records, but Rutgers refuses to accept such evidence, even though it is absolutely required to do so by state law.

250.   As a result, Rutgers' Policy is *ultra vires*, because it is not authorized by current state law, not authorized by any health official, not authorized by any public health emergency, conflicts with an express statutory requirement, and does not meet the requirements of *Jacobson v. Massachusetts.*

251.   In sum, Rutgers' policy is federally preempted, void under state law and fails to meet the requirements of *Jacobson*.

## SECOND CLAIM FOR RELIEF
**(Violation of the Right to Informed Consent and the Right to Refuse Medical Treatment Guaranteed by the Fourteenth Amendment and Article 1 of the Constitution of the State of New Jersey)**

252.   Plaintiffs repeat and reallege the allegations hereabove as if fully set

forth herein.

253.   The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

254.   Under the Due Process Clause, a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment.

255.   The right to refuse medical treatment carries with it an implied right to the information necessary to make an informed decision about whether to refuse the treatment.

256.   Without crucial information about the risks and benefits of a procedure, the right to refuse rings hollow.

257.   Together, the rights to refuse or accept treatment and to information constitute informed consent, guaranteed by the Fourteenth Amendment.

258.   The Due Process Clause requires balancing between an individual's liberty interest in refusing treatment and the state's interest in requiring it.

259.   Presumably, Defendants adopted the Policy to minimize outbreaks of COVID-19 among students; to prevent or reduce the risk of transmission of COVID-19 among all persons at Rutgers University and Rutgers-affiliated health care units; and to promote the public health of the community consistent with federal, State and local efforts to stem the pandemic.

260.   Upon information and belief, Defendants also adopted the Policy to

curry favor with vaccine manufacturers with which they have partnered to investigate and develop COVID-19 vaccines; to gain information and knowledge about the safety and effectiveness of COVID-19 vaccines upon the student body and on campus; and to enlarge the potential market for COVID-19 vaccines in which they share a financial interest.

261.   The full safety and full efficacy of emergency-use authorized COVID-19 vaccines remains unknown.

262.   All COVID-19 vaccines are under investigation and therefore remain experimental vaccines.

263.   The Due Process Clause prohibits Defendants from coercing any individual to accept an experimental medical product.

264.   Rutgers' Policy coerces students to accept experimental vaccines and thus violates the Due Process Clause.

265.   Since Rutgers' Policy was not adopted as a result of any legislative action or health agency or health department directive, elected officials accountable to the People have made no assessment of safety, efficacy, necessity, reasonableness, proportionality or discrimination from a COVID-19 mandate, in violating the Due Process Clause of the Fourteenth Amendment and the specific requirements of *Jacobson v. Massachusetts*.

266.   Furthermore, Rutgers' Policy is not safe, efficacious, necessary,

reasonable, proportional or nondiscriminatory enough to achieve its stated interests, thus violating the Due Process Clause of the Fourteenth Amendment.

267.   Rutgers' Policy coerces students to take vaccines that have not been shown to a reasonable degree of medical certainty to be safe or effective and have not been shown to be safe or effective long-term at all.

268.   On a daily basis, reports mount of more and more recipients being injured or killed by COVID-19 vaccines.  On a daily basis, reports are emerging of previously unknown risks and dangers from these investigatory COVID-19 vaccines.  Similarly, reports are emerging of the waning efficacy of COVID-19 vaccines.  For example, as of August 2, 2021, CDC had received reports from 49 U.S. states and territories of 7,525 patients with COVID-19 vaccine breakthrough infections who were hospitalized or who had died.[35]  However, those numbers are misleading because breakthrough infections are only counted for hospitalizations and deaths, and "vaccinated" persons who are included are only those who have been "fully vaccinated" with a single-dose or double-dose vaccine after a 14-day period.  Thus, CDC intentionally avoids counting "breakthrough" infections that do not result in hospitalization and omits from the count people who tested positive for COVID between doses of a vaccine or within the 14-day period following

---

[35] *See https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html* .

vaccination.

269.   Additionally, the numbers of vaccinated people infected are not materially different from the number of unvaccinated people being infected; and vaccinated people are more likely to spread the disease than unvaccinated people because COVID-19 vaccines hide or diminish symptoms.  Rates of COVID-19 in New Jersey were lower at this time last year when no vaccines were available.

270.   There is absolutely no information or data concerning the long-term safety or long-term efficacy of COVID-19 vaccines because they have been tested on humans for such a short period.

271.   Currently, it is not possible to know with any reasonable degree of medical certainty whether the risks from COVID-19 vaccines outweigh their purported benefits.

272.   As a result, Rutgers' Policy is not narrowly tailored to achieve Defendants' stated interests.

273.   The Policy is *overinclusive* because Rutgers applies it to students who can demonstrate evidence of immunity.

274.   The Policy is *underinclusive* because Rutgers does not mandate that any University administration, faculty, staff, employees or contractors get vaccinated.

275.   The Policy coerces administration of vaccines that are still under

investigation and deemed "experimental" in ongoing clinical trials.

276.   The Policy coerces administration of vaccines for which data are insufficient to assess effectiveness in preventing infection or transmission at this time.

277.   The Policy requires administration of vaccines that have not been proven safe and effective and for which there is no long-term safety or effectiveness data.

278.   The Policy requires administration of vaccines that have injured and killed tens of thousands of people according to VAERS.

279.   The Policy requires administration of vaccines that have proven effective against COVID-19 variants.

280.   The Policy requires administration of vaccines that are being shown in the most recent medical literature to be ineffective in preventing the spread of COVID-19.

281.   The Policy requires administration of vaccines to students who have recovered from COVID-19, for whom it is not medically necessary, and who are at elevated risk of harm from vaccination because of their natural immunity.

282.   As a matter of law, any drug, device, or biologic, such as vaccines, approved for use under emergency-use authorization that is still under investigation cannot meet the requirements of the Due Process Clause and

*Jacobson* for mandatory administration.

283.   Rutgers faculty and staff are excluded from Rutgers Policy and continue to enjoy their rights to informed consent and to refuse medical treatment freely, without consequence or fear of sanction.

284.   Additionally, Defendants are applying and enforcing Rutgers' Policy in a discriminatory, arbitrary and capricious manner by excluding staff and employees who are equally capable of being infected with SARS-CoV-2 and transmitting it to others, including students who have recovered from COVID-19, students who have medical exemptions, students with religious exemptions, and vaccinated students.

285.   Rutgers is applying the Policy arbitrarily and capriciously.  It is denying medical exemptions to students who have submitted medical contraindications supported by their physicians.  It is approving some religious exemption requests and denying others without explaining the criteria and process used to do so.

286.   Rutgers is also misrepresenting the requirements and conditions of its Policy in various communications to students with the intent to confuse, alarm, annoy, harass and coerce students to comply with the Policy against their will and against their legal rights. These tactics include moving the deadline for compliance arbitrarily, enforcing the mandate against students who have registered for only

remote learning coursework (against the express language of the Policy), and

threatening sanctions against them for noncompliance (e.g. barring access to

student university online accounts) and expulsion from academic programs and

athletics.

287.   Defendants' actions and omissions, under color of law, violate

Plaintiffs' right to medical freedom under the Due Process Clause of the

Fourteenth Amendment and Article I of New Jersey's Constitution.

## THIRD CLAIM FOR RELIEF
### (Violation of Equal Protection guaranteed by the Fourteenth Amendment and Article I of the Constitution of the State of New Jersey)

288.   Plaintiffs repeat and reallege the allegations hereabove as if fully set

forth herein.

289.   The Fourteenth Amendment to the United States Constitution states

that no State shall deprive any person within its jurisdiction the equal protection of

the laws.

290.   Similarly, the New Jersey Supreme Court has interpreted Article 1,

Paragraph 1 of the Constitution of the State of New Jersey to include a guarantee

that no person shall be denied the equal protection of the law.

291.   Rutgers' Policy and practice of discriminating against students by

mandating EUA COVID-19 vaccines for them but not for the administration,

faculty, staff, employees or contractors of Rutgers denies students equal protection

of the law. Such actions and omissions are not narrowly tailored to serve any compelling state interest, are not substantially related to any important governmental objective, and are not rationally related to any legitimate state purpose.

292.   Rutgers' Policy and practice of denying students who can demonstrate natural immunity for COVID-19 an exemption denies such students equal protection of the law; such actions and omissions are not narrowly tailored to serve any compelling state interest, not substantially related to any important governmental objective, or rationally related to any legitimate state purpose.

293.   Rutgers Policy and practice banning students who invoke their rights to informed consent and to refuse medical treatment from campus denies such students equal protection of the law; such actions and omissions are not narrowly tailored to serve any compelling state interest, not substantially related to any important governmental objective, or rationally related to any legitimate state purpose.

294.   Rutgers' Policy and practice banning students who invoke their right to a medical exemption from university housing (dormitories) and requiring them to wear a mask on campus denies such students the equal protection of the law; such actions and omissions are not narrowly tailored to serve any compelling state interest, not substantially related to any important governmental objective, or

rationally related to any legitimate state purpose.

295.   Rutgers' Policy and practice banning students who invoke their right to a religious exemption from university housing (dormitories) and requiring them to wear a mask on campus denies them the equal protection of the law; such actions and omissions are not narrowly tailored to serve any compelling state interest, not substantially related to any important governmental objective, or rationally related to any legitimate state purpose.

296.   Since Defendants' Policy, practice, actions and omissions, under color of state law, result in plaintiff students being singled out for discriminatory treatment in a manner that is not properly related to any legitimate governmental objective, Defendants deprive Plaintiffs of equal treatment and equal protection of the laws in violation of the Fourteenth Amendment and Article I of the Constitution of the State of New Jersey.

## FOURTH CLAIM FOR RELIEF
### (Violation of 42 U.S.C. § 1983)

297.   Plaintiffs repeat and reallege the allegations hereabove as if fully set forth herein.

298.   Defendants in their official capacities have violated 42 U.S.C. § 1983 in that they have, acting under color of law, intentionally deprived Plaintiffs of their right to medical freedom, namely their right to informed consent and their right to refuse medical treatment in violation of the Due Process Clause of the

96

Fourteenth Amendment to United States Constitution.

299. Defendants in their official capacities have violated 42 U.S.C. § 1983

in that they have, acting under color of law, intentionally treated Plaintiffs

differently from others similarly situated, with no compelling state interest,

important governmental objective, or rational basis for the difference in treatment,

in violation of Plaintiffs' rights under the Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution.

300. Plaintiffs have suffered damages as a result of Defendants' violation

of their civil rights and seek compensation pursuant to 42 U.S.C. § 1983.

## FIFTH CLAIM FOR RELIEF
### (Violation of the New Jersey Civil Rights Act)

301. Plaintiffs repeat and reallege the allegations hereabove as is fully set

forth herein.

302. The New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c) provides, in

pertinent part, a private cause of action for violations of civil rights as follows:

> Any person who has been deprived of any substantive due
> process or equal protection rights, privileges or
> immunities secured by the Constitution or laws of the
> United States, or any substantive rights, privileges or
> immunities secured by the Constitution or laws of this
> State, or whose exercise or enjoyment of those substantive
> rights privileges or immunities has been interfered with or
> attempted to be interfered with, by threats, intimidation or
> coercion by a person acting under color of law, may bring
> a civil action for damages and for injunctive relief or other
> appropriate relief.

303.   Defendants, acting under color of state law, deprived Plaintiffs of their substantive rights to Due Process (to informed consent, to refuse unwanted medical treatment, to invoke a medical exemption to immunization and to invoke a religious exemption to immunization (guaranteed by state laws, *e.g.* N.J.S.A. 18A:61D-10 *et seq.*), to Equal Protection, to present evidence of immunity in lieu of a vaccination record (guaranteed by N.J.S.A. 18A:61D-1), by mandating the Policy and by applying it arbitrarily and capriciously, by threats, intimidation and coercion, causing Plaintiffs damages, in violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c).

## SIXTH CLAIM FOR RELIEF
### (Estoppel or Detrimental Reliance)

304.   Plaintiffs repeat and reallege the allegations hereabove as if fully set forth herein.

305.   Estoppel is an equitable doctrine, founded in the fundamental duty of fair dealing imposed by law that prohibits a party from repudiating a previously taken position when another party has relied on that position to his detriment.

306.   Generally, its elements are a representation, knowledge that a second person is acting on the basis of that representation, and substantial detrimental reliance by the second person.

307.   Rutgers announced in January 2021 that it would not mandate EUA COVID-19 vaccines for students to return to campus in the Fall for in-person

instruction.

308.   Plaintiffs relied on Rutgers' representation in order to accept admission to the University or continue their academic studies at Rutgers.

309.   When Rutgers reversed its position in March 2021, and mandated COVID-19 vaccines, Plaintiffs were not in a position to accept admission to alternative equivalent colleges and universities, arrange for transfers to equivalent colleges and universities or to entertain other alternatives to attendance at Rutgers.

310.   Plaintiffs have suffered damages and will suffer greater damages in the form of lost time, opportunity and money as a result of their reliance on Rutgers' representations. Some have been forced to make alternative housing arrangements and others may be forced to attend an alternative college or continue their studies elsewhere.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Contract)

311.   Plaintiffs repeat and reallege the allegations hereabove as if fully set forth herein.

312.   Plaintiffs and Defendants entered into a binding contract to provide instruction in exchange for fee under agreed upon terms and conditions that did not include a requirement to take a EUA COVID-19 vaccine.

313.   Defendants had a duty to abide by those terms and conditions and to not change them without Plaintiffs' express authorization.

314.    Defendants breached their contracts with Plaintiffs by adopting unilaterally a Policy mandating EUA COVID-19 vaccines to attend Rutgers, without any enabling statute or requirement by any health authority.

315.    Defendants' breach caused damages to Plaintiffs who accepted admission at Rutgers or decided to continue their academic studies at Rutgers and who will be forced to pursue their studies at an alternative college or university.

**PRAYER FOR RELIEF**

1.      For declaratory judgment, according to statute, 28 U.S.C. § 2201 and 2202;

2.      For general damages, according to proof at trial, according to statute, 42 U.S.C. § 1983 and N.J.S.A. 10:6-2(c);

3.      For pre-judgment and/or post-judgment interest according to statute, 28 U.S.C. § 1961, N.J.S.A. 56:3-13.16(e);

4.      For an award of reasonable attorneys' fees according to statute, 42 U.S.C. §1988 and N.J.S.A. 10:6-2(f);

5.      For equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction that modifies or bars enforcement of the Policy at issue;

6.      For punitive damages in an amount to be proven at trial;

7.     For costs of suit; and

8.     For such other legal and equitable relief as the Court may deem

Plaintiffs entitled to receive.


DATED: August 16, 2021                    GOMEZ LLC
                                          ATTORNEY AT LAW


                                          By:   _s/ Julio C. Gomez_____
                                                 Julio C. Gomez, Esq.

                                          1451 Cooper Road
                                          Scotch Plains, NJ 07076
                                          Tel 908.789.1080
                                          Fax 908.789.1081
                                          jgomez@gomezllc.com

                                          *Attorney for Plaintiffs*

:

## DEMAND FOR JURY TRIAL
## PURSUANT TO FED. R. CIV. P. 38(B)

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure hereby

demand a trial by jury of all issues in this action so triable as of right by a jury.


Dated: August 16, 2021

GOMEZ LLC
ATTORNEY AT LAW


By:   *s/ Julio C. Gomez*
           Julio C. Gomez, Esq.

1451 Cooper Road
Scotch Plains, NJ 07076
Tel 908.789.1080
Fax 908.789.1081
jgomez@gomezllc.com

*Attorney for Plaintiffs*

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

The matter in controversy is not the subject of any other action pending

in any court, or of any pending arbitration or administrative proceeding.

Dated: August 16, 2021.

GOMEZ LLC
ATTORNEY AT LAW


By:   *s/ Julio C. Gomez*
           Julio C. Gomez, Esq.

1451 Cooper Road
Scotch Plains, NJ 07076
Tel 908.789.1080
Fax 908.789.1081
jgomez@gomezllc.com

*Attorney for Plaintiffs*

## VERIFICATION FOR COMPLAINT

Pursuant to 28 U.S.C. § 1746, I, MARY HOLLAND, ESQ. of full age certify as follows:

1.     I am President and General Counsel of Children's Health Defense. which is a Plaintiff to this action.

2.     I have read the foregoing Complaint and all the allegations contained therein.

3.     Except as to the allegations upon information and belief, which allegations I believe to be true, I verify that all the allegations in the Complaint are true to the best of my personal knowledge. the records of Children's Health Defense, or information available through members of Children's Health Defense.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on August 12, 2021

Mary Holland, Esq.