Julio C. Gomez, Esq.
GOMEZ LLC ATTORNEY AT LAW
1451 Cooper Road
Scotch Plains, NJ 07076
Tel 908.789.1080
Fax 908.789.1081
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHILDREN'S HEALTH DEFENSE, INC., PETER CORDI, RAELYNNE MILLER, KAYLA MATEO, ADRIANA PINTO, JAKE BOTHE, AND DOES 1-13, <br><br> *Plaintiffs*, <br><br> -against- <br><br> RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY, BOARD OF GOVERNORS, RUTGERS SCHOOL OF BIOMEDICAL AND HEALTH SCIENCES, CHANCELLOR BRIAN L. STROM, PRESIDENT JONATHAN HOLLOWAY, in their official capacities. <br><br> *Defendants* | Case No. 3:21-cv-15333 (ZNQ-TJB) |

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

TABLE OF CONTENTS

TABLE OF AUTHORITIES…...………………………………………………....ii

INTRODUCTION…………………………………...……..…………………..1

STANDARDS FOR A MOTION TO DISMISS …………………………………...2

ARGUMENT …………………………………………………………………3

I.     ALL PLAINTIFFS HAVE STANDING ……………………………………3

II.    PLAINTIFFS' CLAIMS ARE WELL PLED AND NOT DISMISSIBLE …..5

       A. Plaintiffs' Due Process Claims Are Grounded In Fundamental Rights to
          Informed Consent and To Refuse Medical Treatment ……………………5

       B. Plaintiffs Have Plead a Plausible Denial of Due Process under Strict
          Scrutiny or alternatively, Rational Basis …………………………………11

       C. Plaintiffs Have Pled Plausible Violations of Equal Protection ………...…19

       D. Plaintiffs' 42 U.S.C. § 1983 and NJCRA Claims Survive ……………….....20

       E. Plaintiffs Pled Rutgers Plausibly Violated State and Federal Law………....20

              1.  Violation of Federal Law (Preemption) ………………………..20

              2.  Violation of State Authority (Ultra Vires) ……………………..24

       F.     Plaintiffs Have Successfully Pled Breach of Contract ………………....32

       G.     Plaintiffs Have Properly Pled Estoppel ………………………………33

CONCLUSION ………………………………………………………………....35

<u>TABLE OF AUTHORITIES</u>

*Abdullahi v. Pfizer, Inc.*
562 F.3d 163 (2d Cir. 2009) ……………………………………………21, 22

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) …………………………………………………………2

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) …………………………………………………………2

*Beukas v. Board of Trustees of Fairleigh Dickinson Univ.,*
255 N.J. Super 420 (1992) ………………………………………………32

*Breithaupt v. Abram,*
352 U.S. 432 (1957) ………………………………………………………6

*Bridges v. Houston Methodist Hosp.,*
No. H-21-1774, 2021 WL 2399994, (S.D. Tex June 12, 2021) …………………….…...24

*Burson v. Freeman,*
504 U.S. 191 (1992) ………………………………………………………9

*Carlsen v. Masters, Mates & Pilots Pension Plan Trust,*
80 N.J. 334 (1979) ………………………………………………………33

*Calvary Chapel Dayton Valley v. Sisolak,*
140 S. Ct. 2603 (2020) …………………………………………………...10

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) ……………………………………………………..23

*Cruzan v. Director, Missouri Dept. of Health,*
497 U.S. 261 (1990) …………………………………………………5, 6, 7

*DeMuria v. Hawkes,*
328 F.3d 704 (2d Cir. 2003) …………………………………………..20

*Dougherty v. Drew University,*
534 F. Supp. 3d. 363 (D.N.J. 2021) …………………………………...33

*Freightliner, Corp. v. Myrick,*
514 U.S. 280 (1995) …………………………………………………………..23

*Friends of the Earth Inc. v. Laidlaw Environmental Services, Inc.,*
528 U.S. 167 (2000) …………………………………………………………3

*Goldfarb v. Solimine,*
245 N.J. 326 (2021) …………………………………………………...33

*Gourdine v. Felician College,*
2006 WL 23462578 (N.J. App. Div. 2006) …………………………………………32

*Halgren v. City o Naperville,*
No. 21-cv-05039, 2021 WL 5998583 (N.D. Ill. Dec. 19, 2021) …………………...9

*Hill v. Borough of Kutztown,*
455 F.3d 225 (3d Cir. 2006) …………………………………………………..20

*Housing Authority of City of Atlantic City v. State,*
188 N.J. Super 145 (1983) …………………………………………………33

*In re Nickelodeon Consumer Privacy Litig.,*
827 F.3d 262 (3d. Cir. 2016) …………………………………………………...4

*Ingraham v. Wright,*
430 U.S. 651 (1977) …………………………………………………………9

*Jacobson v. Massachusetts,*
197 U.S. 11 (1905) …………………………………………………...6, 8, 10, 31

*Koontz v. St. Johns River Water Mngmt. Dist.,*
570 U.S. 595 (2013) …………………………………………………………..18

*Leapheart v. Prison Health Services, Inc.,*
No. 3:10-cv-1019, 2010 WL 5391315 (M.D. Pa. Nov. 22, 2010) …………………….9

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)) ………………………………………………………...1

*Messina v. College of New Jersey*
Civ. No. 21-17576, 2021 WL 4786114 (D.N.J. Oct. 14, 2021) ………………………4

*N.J. Turnpike Auth. v. Jersey Cent. Power & Light,*
772 F.2d 25 (3d Cir. 1985) …………………………………………………...4,5

*Neitzke v. Williams,*
490 U.S. 319 (1989) ………………………………………………………………3

*Norris v. Stanley,*
2021 WL 3891615 (W.D. Mich 2021) ………………………………………...24

*Parham v. J.R.,*
442 U.S. 584 (1979) ………………………………………………………………6

*Phillips v. County of Allegheny,*
515 F.3d 224 (3d. Cir. 2008) …………………………………………2, 3, 20

*PLIVA, Inc. v. Mensing,*
564 U.S. 604 (2011) …………………………………………………………..23

*Regan v. Taxation with Representation of Wash.,*
461 U.S. 540 (1983) …………………………………………………………..18

*Rennie v. Klein,*
653 F.2d 836 (3d Cir. 1981) ……………………………………………………9

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
141 S. Ct. 63 (2020) …………………………………………………………..10

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*
547 U.S. 47 (2006) ……………………………………………………………18

*Rutan v. Republican Party of Ill.,*
497 U.S. 62 (1990) ……………………………………………………………18

*Scheuer v. Rhodes,*
416 U.S. 232 (1974) ……………………………………………………………3

*Shloendorff v. Society of New York Hospital,*
211 N.Y. 125, 129-130 (1914) …………………………………………………7

*Snyder v. Massachusetts,*
291 U.S. 97 (1934) …………………………………………………………7

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) …………………………………………………4

*Union Pacific R. Co. v. Botsford,*
141 U.S. 250, 251 (1891) …………………………………………………7

*Valdez v. Grisham,*
No. 21-cv-783, 2021 WL 4145746, (D.N.M. Sept. 13, 2021) ………………………24

*Vitek v. Jones,*
445 U.S. 480 (1980) …………………………………………………6

*Washington v. Glucksberg,*
521 U.S. 702 (1997) …………………………………………………7, 8

*Washington v. Harper,*
494 U.S. 210 (1990) …………………………………………………6

*White v. Napoleon,*
897 F.2d 103 (3d Cir. 1990) …………………………………………9

*Village of Willowbrook v. Olech,*
528 U.S. 562 (2000) …………………………………………………20

U.S. Const., Art. VI, cl. 2 …………………………………………………22

21 U.S.C. § 360bbb-0a …………………………………………………21

21 U.S.C. § 360bbb-3(e)(1)(A) …………………………………………13, 22, 23

38 U.S.C. § 7331 …………………………………………………21

42 U.S.C. § 9501 …………………………………………………21

42 U.S.C. § 300ff-61 …………………………………………………21

21 C.F.R. § 50.20 …………………………………………………21

45 C.F.R. § 46.116 …………………………………………………………21

N.J.S.A. 18A:61D-1 ……………………………………………………..24

N.J.S.A. 18A:61D-8 …………………………………………………28, 30

N.J.S.A. 18A:62-15.1 ………………………………………………………30

N.J.S.A. 26:1A-7 ………………………………………………………...25

N.J.S.A. 26:4-2 ………………………………………………………….26

N.J.S.A. 26:13-14 ………………………………………………………..26

N.J.S.A. 26:13-36 ………………………………………………………..26

N.J.A.C. 8:57-6.21 ………………………………………………………26

N.J.A.C. 8:57-6.4(c) ……………………………………………24, 27, 29, 32

N.J.A.C. § 8:57-6.14 (d) …………………………………………………30

N.J.A.C. § 8:57-6.15 ……………………………………………………30

21 N.J. Reg. 3605-3607 (1989) …………………………………………..28

22 N.J. Reg. 1137-1140 (1990) …………………………………………28, 29

## INTRODUCTION

Plaintiffs are students at Rutgers University and members of Children's Health Defense ("CHD") a non-profit whose focus for many years has been the harm and injury caused by vaccines.  Since the start of the pandemic CHD has consistently produced accurate, well-sourced information concerning COVID-19 generally and COVID-19 vaccines in particular.  All currently available COVID-19 vaccines remain under clinical study in one form or another.  At this time, it is unknown if they prevent infection, transmission, or if they pose any long-term safety risks.  So far there are over a million reports of adverse events and over 20,000 deaths from COVID-19 vaccines nationwide.  If there are no data showing these vaccines prevent transmission, then these vaccines are not capable of minimizing outbreaks and cannot be reasonably mandated to reduce the spread of COVID-19, as Plaintiffs allege. Under such circumstances there is no public interest that can be furthered with these "experimental" vaccines sufficient to outweigh the constitutionally guaranteed rights to informed consent and to refuse medical treatment of student Plaintiffs.  State colleges and universities cannot mandate an experimental vaccine still under investigation for efficacy and safety that does not prevent transmission.  Also if these vaccines do not prevent transmission then there can be no basis for treating vaccinated and unvaccinated people differently.

If the rights to Due Process and Equal Protection mean anything, they mean that every individual must be allowed to choose freely, without coercion, from a state

college or university, whether to consent to COVID-19 vaccines and subject themselves to their unknown risks; and those who refuse, should not be treated differently.

## STANDARDS FOR A MOTION TO DISMISS

Under Federal Rule of Civil Procedure 8(a)(2), Plaintiffs' First Amended Complaint ("FAC") "must contain a 'short plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677-678 (2009) (quoting Rule 8). The Rule "does not require 'detailed factual allegations.'" *Id.* (quoting *Bell Atlantic Corp. v,. Twombly*, 550 U.S. 544, 555 (2007)), only enough to "give the defendant fair notice of what the… claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555; *see also Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d. Cir. 2008). Additionally, courts must still "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 233.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief plausible on its face.'" *Ascroft*, 556 U.S. at 678 ("[t]he plausibility standard is not akin to a "probability requirement" but it asks for more than a sheer possibility that defendant has acted unlawfully.") (quoting *Twombly*, at 570 and 556). "Determining whether a complaint states a plausible claim for relief will… be a content-specific task that requires the reviewing

court to draw on its judicial experience and common sense." *Ascroft*, 556 U.S. at 679.

"When there are well-pleaded factual allegations, a court should assume their veracity

and then determine whether they plausibly give rise to an entitlement to relief."

*Ascroft*, 556 U.S. at 679. "In passing on a motion to dismiss . . . for failure to state a

cause of action, the allegations of the complaint should be construed favorably to the

pleader." *Scheuer* v. *Rhodes*, 416 U.S. 232, 236 (1974). Notably, "Rule 12(b)(6) does not

countenance… dismissals based on a judge's disbelief of a complaint's factual

allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989). In fact, a well-pleaded

complaint survives even if it appears "that a recovery is very remote and unlikely".

*Scheuer v. Rhodes*, 416 U.S. 232 (1974). "Standards of pleading are not the same as

standards of proof." *Phillips,* 515 F.3d at 246.

Finally, "if a complaint is subject to a Rule 12(b)(6) dismissal, a district court

must permit a curative amendment unless such an amendment would be inequitable

or futile." *Phillips*, 515 F.3d at 245 ("a district court must provide the plaintiff with

this opportunity even if the plaintiff does not seek leave to amend") (remanding with

instructions to permit amendment).

## ARGUMENT

## I.   ALL PLAINTIFFS HAVE STANDING.

Defendants concede Adriana Pinto has standing to bring all claims. Brf. at 7.

Since Ms. Pinto is a member of Children's Health Defense ("CHD"), CHD's standing

mirrors hers. *See Friends of the Earth Inc. v. Laidlaw Environmental Services, Inc.,* 528 U.S.

167, 181 (2000) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").  The remaining Plaintiffs, who ultimately received religious exemptions from Rutgers' vaccine mandate, also have standing because they allege that Rutgers' Policy continues to impose unconstitutional conditions upon them (e.g. testing, masking, exclusion from university housing), and Rutgers has reserved the right to impose additional conditions upon exempt students.  FAC ¶ 12.  As in *Messina v. College of New Jersey,* the exempt Plaintiffs here have alleged "an invasion of a legally protected interest that is concrete, particularized, and imminent. Civ. No. 21-17576, 2021 WL 4786114 (D.N.J. Oct. 14, 2021) at n. 2 (citing *Spokeo, Inc. v. Robins*, 136  S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)) and *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 272 (3d. Cir. 2016).

Nor are Plaintiffs' claims moot even though everyone is presently required to mask or faculty and staff are now subject to a federal mandate as Defendants' argue. *N.J. Turnpike Auth. v. Jersey Cent. Power & Light,* 772 F.2d 25, 31 (3d Cir 1985) ("a matter is not necessarily moot simply because the order attacked has expired; if the underlying dispute between the parties is 'one capable of repetition, yet evading review,' it remains a justiciable controversy").  Rutgers' Policy "is subject to change based on factors such as the progress of the COVID-19 pandemic and guidance from

governmental authorities." Counsel Decl. Ex. A.  Since Rutgers imposed a mandate on faculty and staff solely as a result of President Joseph R. Biden, Jr.'s Executive Order 14042, that mandate may dissolve if Biden's Order is successfully challenged. Moreover, the exempt students are entitled to a declaratory judgment since their rights were violated during the period that Rutgers did not mandate faculty and staff. Additionally, nothing in Rutgers' Policy prohibits Rutgers from revoking a religious exemption; religious exemptions were granted vis-à-vis conflicts with COVID-19 vaccines currently available; COVID-19 vaccines are under continuous development and Rutgers is likely to require that students who have received religious exemptions explain how their religious beliefs conflict with any new vaccines that may not pose the same conflicts. Thus the exempt Plaintiffs' claims are "capable of repetition and evading review." *N.J. Turnpike Auth.,* 772 F.2d at 31.

## II.   PLAINTIFFS' CLAIMS ARE WELL-PLED AND NOT DISMISSIBLE.

The Court should deny Defendants' motion to dismiss Plaintiffs' constitutional claims since violations of Due Process, Equal Protection and common law were all properly pled.

### A.  Plaintiffs' Due Process Claims Are Grounded In Fundamental Rights to Informed Consent and to Refuse Medical Treatment.

Plaintiffs have a constitutionally guaranteed right to informed consent and to refuse unwanted medical treatment under the Due Process Clause of the Fourteenth Amendment.  *See Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 269 (1990).

Citing *Jacobson v. Massachusetts*, 197 U.S. 11, 24-30 (1905) (balancing individual liberty interest against State's interest in preventing disease), *Breithaupt v. Abram*, 352 U.S. 432, 439 (1957) ("As against the right of an individual that his person be held inviolable…"), *Washington v. Harper,* 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty"), *Vitek v. Jones,* 445 U.S. 480, 495-496 (1980) (transfer to a mental hospital coupled with mandatory behavior modification treatment implicated liberty interests), and *Parham v. J.R.*, 442 U.S. 584, 600 (1979) ("[A] child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment"), the Supreme Court in *Cruzan* recognized a "liberty interest in refusing medical treatment." *Cruzan*, at 278-79.  The right to refuse unwanted medical treatment "is a logical corollary of the doctrine of informed consent."  *Id.* at 270.  A person's liberty interest under the Due Process Clause in avoiding unwanted medical treatment "must be determined by balancing his liberty interests against the relevant state interests."  497 U.S. at 278-79 (citing *Jacobson v. Massachusetts*, 197 U.S. 11, 24-30 (1905) ("There is, of course, a sphere within which the individual may assert the supremacy of his own will and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will"); *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 269 (1990) ("The principle that a competent

person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions.").

In order for this right to be deemed "fundamental" and therefore deserving of strict judicial scrutiny in tiers of constitutional adjudication, it must be deeply rooted in the nation's history. Rutgers argues Plaintiffs' claims are not so deeply rooted, Brf. at 12, but Supreme Court precedent dispels that argument. *See Washington v. Glucksberg,* 521 U.S. 702, 720-721 (1997) ("[W]e have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties, which are, objectively, 'deeply rooted in this Nation's history and tradition'.") (citing *Snyder v. Massachusetts,* 291 U.S. 97, 105 (1934) ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"). This right is so rooted.

"At common law, even the touching of one person by another without consent and without legal justification was a battery." *Cruzan,* 497 U.S. at 269. *See Union Pacific R. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ("[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."); *Shloendorff v. Society of New York Hospital,* 211 N.Y. 125, 129-130 (1914)( cited by *Cruzan*) ("Every human being of adult years and sound mind has a right to determine what shall be done with his own body").

Even the Court in *Jacobson v. Massachusetts*, recognized, "[t]here is, of course, a sphere within which the individual may assert the supremacy of his own will and rightfully dispute the authority of any human government, especially of any free government existing under a written constitution, to interfere with the exercise of that will".  197 U.S. 11, 24-30 (1905).

The Supreme Court's decision in *Washington v. Glucksberg,* 571 U.S. 702 (1997), should settle the question that the right to informed consent and to refuse unwanted medical treatment is a "fundamental right" entitled to "strict scrutiny".  Deciding first that the Due Process Clause "protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty," such that "neither nor justice would exist if they were sacrificed" and that substantive due process requires a "careful description" of the asserted fundamental liberty interest, *Glucksberg* concluded that "the right assumed in *Cruzan*," was not "simply deduced from abstract concepts of personal autonomy but rather "the common law rule that forced medication was a battery, and the long tradition protecting the decision to refuse unwanted medical treatment," and thus the right recognized in *Cruzan's* "assumption was entirely consistent with this Nation's history and constitutional traditions."  *Id.* at 724-25.  The conclusion from this analysis is that *Glucksberg* can stand for the proposition that this is a fundamental right. 521 U.S. 725 (distinguished from the right to die which has not enjoyed similar protection).

The Third Circuit has embraced this view that these are "fundamental" rights:

> The Due Process clause of the Fourteenth Amendment substantively protects certain fundamental rights. Among these are the right to be free from unjustified intrusions into the body, *Ingraham v. Wright*, 430 U.S. 651, 673 (1977), the related right to refuse unwanted medical treatment, *Rennie v. Klein*, 653 F.2d 836, 844 (3d Cir. 1981), and as we decide today, the right to sufficient information to intelligently exercise those rights.

*White v. Napoleon,* 897 F.2d 103, 111 (3d Cir. 1990); *see also Leapheart v. Prison Health Services, Inc.,* No. 3:10-cv-1019, 2010 WL 5391315 (M.D. Pa. Nov. 22, 2010) at *6 ("[I]t is well-settled the Due Process Clause of the Fourteenth Amendment substantively protects certain fundamental rights"). This Court is bound by Third Circuit precedent to view Plaintiffs' rights to informed consent and to refuse unwanted medical treatment as fundamental. Accordingly, Rutgers' Policy must be "narrowly tailored to a compelling state interest." *See Burson v. Freeman,* 504 U.S. 191, 198 (1992) (when fundamental rights are at stake, "the state must show that the regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end").

Jacobson does not exist in a vacuum and must be read in conjunction with the Supreme Court's jurisprudence since *Jacobson* was decided more than 100 years ago before courts articulated the right to informed consent and the right to refuse unwanted medical treatment was fundamental and before tiers of judicial scrutiny were developed. Therefore, *Jacobson* is antiquated, somewhat instructive and most certainly is not dispositive. *See Halgren v. City o Naperville,* No. 21-cv-05039, 2021 WL 5998583 (N.D. Ill. Dec. 19, 2021) ("[M]odern courts cannot adopt a blunt application

of *Jacobson's* 'substantial relation' deference test.  Instead courts must interpret *Jacobson* through the lens of constitutional analysis."); *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 74 (2020) (Kavanaugh, J., concurring) (addressing *Jacobson* cautioned: "judicial deference in an emergency or crisis does not mean wholesale abdication, especially when important questions of religious discrimination, racial discrimination, free speech or the like are raised."); *see also Calvary Chapel Dayton Valley v. Sisolak,* 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting) ("[I]t is a mistake to take the language in *Jacobson* as the last word on what the constitution allows public officials to do during the COVID-19 pandemic.").

Moreover, *Jacobson* dealt with a 100-year old smallpox vaccine which the passage of time had demonstrated was effective in preventing the spread of smallpox. 197 U.S. at 23-24 and footnotes.  This case is not *Jacobson*.  According to Plaintiff's factual allegations, based on the FDA, there are insufficient data that COVID-19 vaccines prevent infection or transmission and there are no data of long term health effects.  The City of Cambridge's interest in protecting against the spread of smallpox could be achieved with the smallpox vaccine that had been available and observed as effective for decades.  Not so here, where Plaintiffs allege so many unknowns about the efficacy and safety of COVID-19 vaccines.  FAC ¶¶ 139-188.

Additionally, *Jacobson* holds that even a vaccine that has been employed for over 100 years and demonstrated to prevent transmission must still be reasonably mandated, necessary for public health, and proportional to the need. 197 U.S. at 27-33

("if a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."). *Jacobson* requires vaccines to be safe, efficacious, necessary, proportional to the need, and accord with the civil rights guaranteed. These requirements are consistent with the current view that Courts deem the right to informed consent and refuse unwanted medical treatment as "fundamental." *Cruzan* and its progeny essentially give greater weight to the requirements of *Jacobson* in the current judicial landscape. Defendants misread the substance of Plaintiffs' Due Process Claims; they are not arguing against any vaccine requirements, Brf. at 11, but rather against vaccines with so many unknowns.

Essentially, for vaccines to qualify for a mandate under *Jacobson* and *Cruzan* today, that would outweigh the Due Process liberty interest in the Due Process Clause as it is currently understood, vaccines today <u>must</u> be confirmed to prevent infection and transmission so they can be deemed necessary (or reasonable) to curtail the spread of COVID-19; their risks and safety profile must be known to permit a mandate to be narrowly tailored (or reasonably related) to those who would need the vaccines the most and are least likely to be injured by them.

### B. Plaintiffs Have Plead a Plausible Denial of Due Process under Strict Scrutiny or alternatively, Rational Basis.

Consistent with *Jacobson, Cruzan, Harper, Glucksberg* and *Napoleon,* strict scrutiny should be applied to their claims, not rational basis as Rutgers claims, and Rutgers' Policy must be narrowly tailored to a compelling state interest.  In the alternative, even if this Court were to apply rational basis, at this stage, on the current record, assuming Plaintiffs' facts are true, it is plausible that Rutgers' Policy does not meet the requirements of rational basis because there are too many unknowns about COVID-19 vaccines.

The expressed purpose of Rutgers' Policy is to "minimize outbreaks of COVID-19" and to "prevent and reduce the risk of transmission of COVID-19." FAC ¶ 280.  These are legitimate, even compelling state interests.  However, Plaintiffs have also alleged that Defendants' financial relationships with COVID-19 vaccine manufacturers create conflicts of interest that may explain the decision to reverse course to issue the mandate after all.  FAC ¶¶ 124-138.  Assuming these facts are true, Defendants do not have a legitimate interest.  This Court is also required to accept the following facts in Plaintiffs' First Amended Complaint as true:

First, and foremost, according to the FDA, there are insufficient data to know the efficacy of currently available COVID-19 vaccines or boosters in preventing asymptomatic infection or transmission of SARS-CoV-2.  FAC at 1 and ¶¶ 139-188.

Second, according to the FDA, there are insufficient data to know that COVID-19 vaccines as safe.  FAC ¶¶ 124-127.  There is absolutely no data or information concerning whether COVID-19 vaccines pose any long-term risks.  FAC

¶¶ 147, 148, 175, 291.  With this information lacking, whether the benefits of COVID-19 vaccines outweigh their risks is unknown.  FAC ¶ 6.

FDA permits use of all currently available COVID-19 vaccines under Section 564 of the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 360bbb-3, which is an "emergency use authorization" ("EUA"), whose purpose is to make products available that have not gone through FDA's full safety and efficacy review process. FAC ¶¶ 55-64.  All currently available COVID-19 vaccines, testing and even masking are made available under EUA.  FAC ¶ 65.  FDA is required to ensure that individuals are informed of "the option to accept or refuse administration" of EUA products.  21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).  Even clinical studies for Pfizer's "Comirnaty" vaccine are ongoing, FAC ¶ 77, and in any event, Pfizer's licensed vaccine is not currently available.  FAC ¶ 125.

As a result of their status as EUA products, COVID-19 vaccines are deemed by the FDA and the NIH as "experimental" vaccines and these agencies use those terms interchangeably to describe them.  FAC ¶¶ 124-126.  Furthermore, these vaccines were only tested on human subjects for six (6) months before release, and clinical studies for these vaccines are ongoing and will not be completed for several years.  FAC ¶ 127, 147.  Rutgers is engaged in clinical studies on all three vaccines, has multi-million dollar financial ties to all three COVID-19 vaccine manufacturers, and those relationships pose conflicts of interest in deciding to mandate them.  FAC ¶¶ 128-138.  EUA testing and masking are in the same investigational position.  There is

13

no test to determine if individuals are infectious.  FAC ¶ 91.  FDA has never approved any face mask as being effective against COVID-19.  FAC ¶ 83.

Significantly, COVID-19 vaccines are causing injury and death if Plaintiffs' allegations are accepted as true.  In less than a year COVID-19 vaccines have killed and injured more people than all other vaccines tracked in the government's national Vaccine Adverse Event Reporting System since its inception.  FAC ¶ 7.  VAERS is co-administered by the FDA and CDC and currently tallies over one million reports of adverse events, including more than 20,000 deaths, and 166,000 serious injuries from COVID-19 vaccines.[1]  It is alleged Defendants did not consider this information.  FAC ¶¶ 155, 224.

Rates of COVID-19 were lower when vaccines were not available.  FAC ¶ 53. Studies suggest that COVID-19 vaccines do not work, and whatever benefit they impart wanes or boosters would not be needed.  FAC ¶ 96-97.  These are not "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or even "naked assertions devoid of further factual enhancement."  *Ashcroft,* 556 U.S. at

---

[1] "VAERS data released Friday [January 7, 2022] by the Centers for Disease Control and Prevention included a total of 1,017,001 reports of adverse events from all age groups following COVID vaccines, including 21,382 deaths and 166,606 serious injuries between Dec. 14, 2020, and Dec. 31, 2021."  Megan Redshaw, *7-Year Old Dies 11 days after Pfizer Shot,* The Defender (January 7, 2022), available at https://childrenshealthdefense.org/defender/vaers-cdc-child-dies-pfizer-covid-vaccine/.  (last visited January 11, 2022).   *See also https://www.medalerts.org/vaersdb/findfield.php?TABLE=ON&GROUP1=CAT&EVENTS=ON&VAX=COVID19* (last visited January 11, 2022).

678.  These allegations are based on statements from the FDA itself.  FAC at 1, ¶¶ 83, 140, 147, 160, 165, 170.

In essence, Plaintiffs pled that there are insufficient data to know that COVID-19 vaccines prevent infection or transmission, no data of long term health risks, increasing data about death and injury caused by these vaccines.  FAC ¶¶ 139-157. Construing these facts in the light most favorable to Plaintiffs there is no way for an institution mandating these vaccines to reasonably weigh the risk and benefits, and no way to assess how to mandate these vaccines in a manner that is narrowly tailored to achieve a compelling state interest in reducing the spread of contagious disease.  The lack of knowledge and information as to whether these vaccines prevent transmission even makes it impossible for any college or university to say reasonably that mandating them is rationally related to a reduction in transmission.  Because of the alleged unknowns surrounding COVID-19 vaccines mandating them is not sufficiently related to Rutgers' express purpose of minimizing outbreaks or preventing transmission on campus, against the weight of a person's right to refuse in light of so many unknowns about the risks and safety of these COVID-19 vaccines, especially while they remain "experimental."  *See discussion* at Section E.1 *infra.* Contrary to Defendants' arguments, Brf at 14, Plaintiffs are not asking the Court to make its own judgments about effectiveness; Plaintiffs allege that FDA has determined presently

15

there are no data to confirm COVID-19 vaccines prevent transmission;[2] if Plaintiffs'

allegations are true, then colleges and universities cannot mandate these vaccines and

make distinctions between vaccinated and unvaccinated students.

In sum, the import of Plaintiffs' allegations are that no one knows if COVID-

19 vaccines actually prevent infection or transmission, if they pose any long-term side

effects or risks, if they are effective against mutating strains of the virus, or if they are

responsible for more than 1 million adverse events, killing upwards of 20,000 people

and injuring more than 100,000.  In the absence of such knowledge, mandating these

vaccines at this juncture, without such knowledge, is neither narrowly tailored nor

reasonably related and Rutgers' Policy cannot stand if Plaintiff can present evidence of

these allegations.  The same cannot be said about other vaccines; only COVID-19

vaccines are under EUA, with clinical studies still ongoing.  Their use remains

---

[2] The FAC cites FDA Briefing Documents that set forth all of the unknowns about
these EUA COVID-10 vaccines.  FAC at 1.  For example, FDA's Briefing Document
on the Pfizer BioNTech COVID-19 vaccine sets out the unknown benefits and data
gaps associated with this vaccine: "Duration of protection" (unknown past two
months); "Effectiveness in certain populations at high risk of severe COVID-19"
(unknown for immunocompromised); "Effectiveness in individuals previously
infected with SARS-CoV-2" ("data are insufficient"); "Future vaccine effectiveness as
influenced by characteristics of the pandemic, changes in the virus, and/or potential
effects of co-infections" ("uncertainties"); "Vaccine effectiveness against
asymptomatic infection" ("data are limited to assess the effect"); "Vaccine
effectiveness against long-term effects of COVID-19 disease" ("not possible to
assess"); "Vaccine effectiveness against mortality" ("Benefits in preventing death
should be evaluated in large observational studies following authorization"); "Vaccine
effectiveness against transmission of SARS-CoV-2." ("Data are limited to assess the
effect.").  Counsel Decl. Ex. B at 46-48.

"experimental" and the decision to take such vaccines must remain with the individual while these vaccines are under investigation.

Not surprisingly, to date, neither the State Legislature, the Governor under his emergency authority, the Department of Health, or the Commissioner of Health under his emergency authority have mandated COVID-19 EUA vaccines for attendance at public or private institutions of higher education.  FAC ¶¶ 113 and 114.

It is alleged Rutgers did not consider or attempt to use less intrusive measures alternative to its Policy, such as temperature testing, self-administered and documented wellness checks, staggered scheduling, social distancing, prophylactic recommendations to the student body or other measures in lieu of its COVID-19 vaccine mandate.  FAC ¶ 225.  In view of Plaintiffs' allegations, Rutgers' requirement that students with fully remote schedules must also vaccinate is particularly overbroad since they would be on campus less often than vaccinated students to spread the disease.

Plaintiffs have alleged that breakthrough infections of the Delta variant demonstrate the ineffectiveness or waning efficacy of COVID-19 vaccines.  FAC ¶¶ 140, 143.  The emergence of the Omicron variant confirms that fact in spades.  Even though Rutgers has boasted that the vast majority of its students and staff are vaccinated, it has decided to start the Spring semester this year remotely.  *See* *https://coronavirus.rutgers.edu/significant-changes-related-to-covid-19/* This decision was made

because COVID-19 vaccines are not working, and if they do not work, they cannot be mandated.

Furthermore, Rutgers' argument that students do not have a right to attend Rutgers is of no moment here. It is well-settled, that "the government may not deny a benefit to a person because he exercises a constitutional right." *Koontz v. St. Johns River Water Mngmt. Dist.*, 570 U.S. 595, 604 (2013):

> In *Perry v. Sinderman,* 408 U.S. 593 (1972), for example, we held that a public college would violate a professor's freedom of speech if it declined to renew his contract because he was an outspoken critic of the college's administration. And in *Memorial Hospital v. Maricopa County,* 415 U.S. 250 (1974), we concluded that a county impermissibly burdened the right to travel by extending healthcare benefits only to those indigent sick who had been residents of the county for at least one year. Those cases reflect an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up.

*See also e.g. Regan v. Taxation with Representation of Wash.,* 461 U.S. 540 (1983); *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,* 547 U.S. 47 (2006); *Rutan v. Republican Party of Ill.,* 497 U.S. 62 (1990). "[R]egardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Koontz,* 570 U.S. at 606. If Plaintiffs' allegations are true then Rutgers' Policy pressures students' to forfeit the right to informed consent and the right to refuse unwanted medical

18

treatment by threatening to withhold the benefit of attending a public university or continuing their studies.

### C. Plaintiffs Have Plausibly Pled Violations of Equal Protection.

Contrary to Defendants' arguments, Brf. at 17-18, Plaintiffs allege more violations of Equal Protection. They allege that Rutgers' Policy unlawfully discriminates against them for invoking their Due Process rights. FAC 315. They allege also that naturally immune students are similarly situated to vaccinated students and should be treated similarly. FAC ¶ 314. Defendants do not challenge these claims. They also allege that Rutgers' initial decision to mandate students but not staff and employees intentionally treated them differently from others similarly situated and that there is no rational basis for the difference in treatment, or it does not satisfy the requirements of strict scrutiny. FAC ¶ 313. They allege that Rutgers' decision to mandate that only exempt students test weekly, wear masks and be banned from university housing because they are unvaccinated is another example of the university treating them differently from others similarly situated. If the vaccines do not prevent transmission, as Plaintiffs allege, then vaccinated and unvaccinated students are similarly situated because they can spread the virus equally – and Rutgers' intentional policy of treating them differently would have no rational basis for the difference in treatment (or would not satisfy the requirements of strict scrutiny).

The Equal Protection claims that Defendants attack are recognized as "class of one" equal protection claims, governed by the Supreme Court's holding in *Village of*

*Willowbrook v. Olech,* 528 U.S. 562 (2000).  The Third Circuit acknowledges such "class of one" equal protection claims and held that "to state a clam under that theory, a plaintiff must allege that (1) the defendant treated him differently from others similarly situated; (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment."  *Phillips v. County of Allegheny,* 515 F.3d 224, 243 (3d Cir. 2008); *Hill v. Borough of Kutztown,* 455 F.3d 225 (3d Cir. 2006); *see also DeMuria v. Hawkes,* 328 F.3d 704 (2d Cir. 2003).  Accepting Plaintiffs' allegations as true, these "class of one" equal protection claims have been properly pled because Rutgers' Policy did not impose a vaccine mandate on faculty or staff.  Plaintiffs allege that they are similarly situated to faculty and staff because they are just as capable of spreading COVID-19.  As stated, since Plaintiffs also allege that because COVID-19 vaccines do not prevent transmission, vaccinated students and unvaccinated students are similarly situated regarding their ability to spread COVID-19 and requiring only the unvaccinated students the burden of testing, masking, or being excluded from the dormitories is unreasonable.

### D. Plaintiffs' 42 U.S.C. § 1983 and NJCRA Claims Survive.

Since Plaintiffs have pled deprivations of underlying constitutional rights by Defendants, acting *under color of state law* (which Defendants do not dispute), their claims for money damages under 42 U.S.C. § 1983 and NJCRA survive at this stage.

### E. Plaintiffs Plausibly Pled Rutgers Violated State and Federal Law.

#### 1.  Violation of federal law (preemption)

Until the FDA approves an Investigational New Drug Application and grants a license, it is considered experimental.[3]  The principle that it is illegal to coerce an individual to accept an experimental medical product is incorporated into the United States Code, the Code of Federal Regulations and guidance from health agencies.  *See e.g.* 21 U.S.C. § 360bbb-0a (investigational drugs for use by patients with a life-threatening disease or conditions require written informed consent); 42 U.S.C. § 9501 (requiring same for mental health patients); 38 U.S.C. § 7331 (same for veterans); 42 U.S.C. § 300ff-61 ("in testing an individual for HIV/AIDS, the applicant will test an individual only after the individual confirms that the decision of the individual with respect with respect to undergoing such testing is voluntarily made."); 21 C.F.R. § 50.20 (establishing conditions for obtaining informed consent for unlicensed medical product in research including that consent should be free from "coercion or undue influence"); 45 C.F.R. § 46.116 (for unlicensed products in research "basic elements of informed consent" include a "statement that participation is voluntary" and "refusal to participate will involve no penalty or loss of benefits," and investigators must "minimize the possibility of coercion or undue influence"); FDA's *Information Sheet: Informed Consent* ("Coercion occurs when an overt threat of is intentionally presented by one person to another in order to obtain compliance.")[4].  *See also Abdullahi v. Pfizer,*

---

[3] *See https://www.fda.gov/media/138490/download* ("an investigational drug can also be called an experimental drug");

[4] *See https://www.fda.gov/regulatory-information/search-fda-guidance-documents/informed-consent#coercion* (last visited January 11, 2022).

*Inc.* 562 F.3d 163, 184 (2d Cir. 2009) ("The Nuremberg Code, Article 7 of the ICCPR, the Declaration of Helsinki, the Convention on Human Rights and Biomedicine, the Universal Declaration on Bioethics and Human Rights, the 2001 Clinical Trial Directive, and the domestic laws of at least eighty-four States all uniformly and unmistakably prohibit medical experiments on human beings without their consent, thereby providing concrete content for the norm.").  That near universal principle applies to the EUAs for COVID-19 vaccines which were issued pursuant to 21 U.S.C. § 360bbb-3, and which, as a condition of emergency use authorization, requires the Secretary to establish "appropriate conditions designed to ensure that individuals to whom the product is administered are informed" of, *inter alia*, "the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." 21 U.S.C. § 360bbb-3(e)(1)(A).  Read together these federal statutes and regulations require individuals to exercise informed consent to a COVID-19 vaccine under EUA, or EUA testing and practices (e.g. masking).  It is impossible for students who object to COVID-19 vaccination to simultaneously exercise the informed consent required by 21 U.S.C. § 360bbb-3(e)(1)(A) and comply with Rutgers' Policy.  In other words, students who are coerced by Rutgers Policy, cannot give the informed consent that EUA requires.

The Supremacy Clause establishes that federal law is supreme.  U.S. Const., Art. VI, cl. 2.  Pre-emption analysis requires a comparison of federal and state law.

*PLIVA, Inc. v. Mensing*, 564 U.S. 604, 611 (2011). "State law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. National Foreign Trade Council,* 530 U.S. 363 (2000). The Supreme Court has held that "state and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements'." *PLIVA, Inc.,* 564 U.S. at 618 (quoting *Freightliner, Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (finding impossibility where it was not lawful under federal law for drug manufacturers to do what state law required of them). Similarly, in this case, federal law requires every person to give uncoerced informed consent before receipt of an EUA COVID-19 vaccine. 21 U.S.C. § 360bbb-3(e)(1)(A). Plaintiffs allege Rutgers' Policy coerces students who object to COVID-19 vaccination to give up informed consent in order to comply with the Policy. FAC ¶¶ 261-263. If a student surrenders informed consent to comply with Rutgers' Policy he violates federal law; if the same student exercises informed consent under 21 U.S.C. § 360bbb-3(e)(1)(A) and refuses COVID-19 vaccination he violates Rutgers' Policy. *See PLIVA, Inc.*, 564 U.S. at 620 ("[t]he question for 'impossibility' is whether the private party could independently do under federal law what state law requires of it"). If Plaintiffs can present evidence that they were coerced by Rutgers' Policy, as alleged, FAC ¶ 133, then they will be in a position to prove the doctrine of impossibility preemption.

Defendants argue that Rutgers has "not 'mandated' any particular action, but has only made adherence to its mandate a condition of enrollment." Brief at 26.

Plaintiffs have countered that this action violates the unconstitutional conditions

doctrine.  *See discussion* at 17-18, *supra*.  Additionally, conditioning a benefit, or

threatening the loss of a benefit to gain consent to administration of an unlicensed

product is precisely the type of "coercion" that is contemplated and forbidden by the

federal statutory scheme governing such products.  Everything about Rutgers' Policy

conflicts with the right to informed consent reflected in Section 564 because it

renders it impossible for students who object to EUA vaccines, tests and masks to

exercise that right.  The cases cited by Rutgers, *Bridges v. Houston Methodist Hosp.,* No.

H-21-1774, 2021 WL 2399994 , at *2 (S.D. Tex June 12, 2021) and *Valdez v. Grisham*,

No. 21-cv-783, 2021 WL 4145746, at *4 (D.N.M. Sept. 13, 2021), did not consider

this conflict from the point of view of the student.  *But see Norris v. Stanley,* 2021 WL

3891615 (W.D. Mich 2021) (questioning this position in view of Pfizer vaccine

approval).  Finally, Plaintiffs allege Pfizer's Comirnaty vaccine is unavailable, FAC ¶

125, if true its licensure does not cure this preemptive conflict.

### 2.  Violation of state authority (*ultra vires*)

Rutgers argues that New Jersey law explicitly authorizes Rutgers' Policy.

However, neither N.J.S.A. § 18A:61D-1 or N.J.A.C. § 8:57-6.4(c) authorize Rutgers to

mandate novel vaccines upon its students.

First, N.J.S.A. 18A:61D-1 has no language delegating police powers to Rutgers

to mandate any vaccines.  In fact, it contains no language empowering Rutgers to do

anything.  By its plain text, this statute instead requires Rutgers to collect from

students "as a condition of admission or continued enrollment" their valid immunization record, "which documents the administration of all required immunizations against vaccine-preventable disease, or evidence of immunity from these diseases, in accordance with regulations promulgated by the Department of Health." Additionally, this statute only allows Rutgers to collect such records from a student who is "30 years of age or less" – reading into this statute, the absurd meaning that Rutgers proposes, would impede Rutgers from mandating vaccines on students who are 30 years of age or less. This statute has nothing to do with mandating vaccines. Moreover, taking Plaintiffs' allegations as true, this statute is wholly inapplicable since Plaintiffs are alleging that COVID-19 vaccines do not prevent infection or transmission, and if true, COVID-19 vaccines cannot be categorized as "immunizations against vaccine-preventable diseases". FAC at 1 and ¶¶ 140-43, 297. Moreover, the Department of Health has not promulgated any regulations requiring COVID-19 vaccines for attendance at public institutions of higher education. Rutgers' proposed interpretation of this statute is at odds with New Jersey's entire legal framework for compulsory vaccination.

New Jersey's Department of Health has the power to mandate vaccines: acting through New Jersey's Public Health Council, the Department of Health can mandate vaccines *but only* if it publishes the proposed regulation, holds a public hearing and gives the public the opportunity to comment. *See* N.J.S.A. 26:1A-7 (power to establish State Sanitary Code, including immunization against disease); *see also* N.J.S.A.

26:4-2 (general powers). The Commissioner of Health can mandate vaccines unilaterally, *but only* during a public health emergency.  *See* N.J.S.A. 26:13-14.  Most recently, the Governor can mandate vaccines unilaterally as a result of recent powers temporarily vested in him by the state legislature, but *only* until January 11, 2022.  *See* N.J.S.A. 26:13-36.  Finally, in the context of higher education, in a section entitled, "Modifications "[i]n the event of an outbreak or threatened outbreak" only the Commissioner of Health or local health officers (which Rutgers is not) "may modify the immunization requirements as set forth in this subchapter to meet the emergency."  N.J.A.C. 8:57-6.21.  "These modifications may include obtaining immunization documentation *or requiring specific immunizations for each student not covered by this subchapter.*"  N.J.A.C. 8:57-6.21(a)(1).  Thus, concerning higher education immunization requirements, only the Commissioner or local health officers are authorized to act in the event of an outbreak to mandate "specific immunizations" that are not already set forth in the regulations "to meet the emergency."  There is no express provision that Rutgers, or any other public or private institution of higher education can take action "in the event of an outbreak" to mandate new vaccines for college attendance and there is good reason for that: in the event of an outbreak it makes no sense for public or private institutions to have discretion about what vaccines to mandate or when; moreover, N.J.A.C. 8:57-6.21 gives the Commissioner – and only the Commissioner – the power to temporarily suspend an immunization requirement for higher education in the event of a national or state "vaccine

26

shortage." The Commissioner's ability to coordinate a uniform response to an outbreak would be meaningless if colleges and universities have independent authority to mandate new vaccines in the event of an outbreak. To date, none of the government officials in New Jersey who are expressly empowered to mandate compulsory vaccination in response to an outbreak of COVID-19 have mandated any such vaccines for college attendance.[5]

As a last resort, Rutgers points to N.J.A.C. 8:57-6.4(c) for the proposition that Rutgers is authorized to require other ACIP-recommended vaccinations. Brf. at 26. However, N.J.A.C. 8:57-6.4(c) (formerly N.J.A.C. 8:57-6.2(c), and before 1995, N.J.A.C. 9:2-14.2(b)) does not authorize Rutgers to do anything "during an outbreak" and at most, it only permits colleges and universities to establish "additional requirements for student immunizations and documentation recommended by ACIP" not additional specific immunizations for students, and certainly not EUA vaccines. Read in conjunction with New Jersey's legal framework, this regulation only means that colleges and universities can impose additional requirements and documentation on immunizations that are required by existing statutes or regulations, if ACIP recommends it; this could include for example, changes in the types of the documentation that should be accepted as proof of vaccination or a particular hepatitis B vaccine. *See* N.J.S.A. 18A:61D-8.

---

[5] Plaintiffs do not concede that these government officials can mandate EUA Covid-19 vaccines, especially in light of Plaintiffs' allegations about such vaccines and the requirements of *Jacobson, Cruzan* and its progeny.

This regulation appears to have been proposed for the first time in 1989; and the administrative history of this regulation[6] does not support Rutgers' interpretation that more than 30 years ago the state of New Jersey gave Rutgers *carte blanche* authority to unilaterally impose any new vaccine on its student body it deemed appropriate if ACIP recommended it.  *See* 21 N.J. Reg. 3605-3607 (1989) (original version of rule proposed for N.J.A.C. 9:2-14.2(c)); 22 N.J. Reg. 1137-1140 (1990) (original version of rule adopted and codified at N.J.A.C. 9:2-14.1(b)). *See* Counsel Decl. Ex. B and C, filed herewith. Plaintiffs have not found anywhere in the administrative history of this regulation going back to 1989 any discussion or suggestion that Rutgers (and every other college and university) has discretion to unilaterally increase the types of vaccines that students must take to attend.  Absent such an express delegation of police power, like in *Jacobson*, Rutgers' reliance on this regulation should not be used to condone chilling the free exercise of the Due Process rights of Plaintiffs or the 70,000 students at Rutgers.

Moreover, when this regulation was originally proposed Rutgers lodged a public comment to express its concerns that "standards within the rules and the underlying legislation are inadequate as approximately 10% of those individuals

---

[6] *See* 21 N.J. Reg. 3605 (1989) (original rule proposal for N.J.A.C. 9:2-14(c)); 22 N.J. Reg. 1137-1140 (original rule codified at N.J.A.C. 9:2-14.1(b)); 27 N.J. Reg. 3631(a) (1995) (recodified at N.J.S.A. 8:57-6.2(c)); 27 N.J. Reg. 4701(a) (1995); 33 N.J. Reg. 2752(a) (2001); 34 N.J. Reg. 3023(a) (2002); 36 N.J. Reg. 3335(a) (2004); 37 N.J. Reg. 3037(b) (2005); 40 N.J. Reg. 1962(a) (2008) (proposal to recodify at N.J.S.A. 8:57-6.4(c)); 41 N.J. Reg. 1419(a) (2009) (recodified at N.J.A.C. 8:57-6.4(c)).

vaccinated prior to 1980 are not adequately protected due to vaccine failure." 22 N.J.
Reg. 1138 (1990) (Counsel Decl., Ex. C).  In response to Rutgers' comment, the
Board of Higher Education at the time consulted with the Department of Health
which did not "recommend a change in the rules with regard to vaccine requirements
at this time." *Id.*  Back then, the only required immunizations were for measles,
mumps and rubella; immunization between 1968 and 1980 sufficed to meet the
requirement for attendance.  *Id.* Rutgers' concern that the rules being proposed did
not require proof of vaccination post-1980 would be unfounded if Rutgers could
simply mandate such immunizations under these new regulations, especially when the
original formulation of the regulation did not require a supporting ACIP
recommendation to do so.  *See* Counsel Decl. Ex. D at 21 N.J.R. 3606 ( § 9:2-14.2).

Rutgers' comment to the 1989 rule proposal would be completely unnecessary
if the regulation it relies upon, N.J.A.C. 8:57-6.4(c), has always meant that a university
had the authority to require more vaccinations unilaterally on its student body.
Despite the administrative history of this regulation belying that interpretation, that is
exactly what Rutgers claims this regulation means today: that it is a unilateral authority
to impose whatever new vaccine Rutgers deems appropriate upon the student body
with no restrictions (except in the current version of the rule, if recommended by the
Advisory Committee on Immunization Practices ("ACIP") of the Centers for Disease
Control and Prevention).

This regulation clearly is not a delegation of police power to mandate vaccines, and Rutgers' reliance on this rule is mere sophistry.  Moreover, this regulation is certainly not an authorization to mandate vaccines that are not licensed and fully approved by the FDA.  Additionally, if colleges and universities could simply add new vaccines to those required by the state Department of Health to attend college, then there would be no need for the State Legislature to devote considerable time and resources to passing statutes requiring additional vaccines for college attendance since the adoption of this regulation in 1990.  *See e.g.* N.J.S.A. 18A:61D-8 (hepatitis B vaccine); N.J.S.A. 18A:62-15.1 (meningococcal vaccine).

Similarly, Rutgers' reliance upon N.J.A.C. § 8:57-6.14 (d) and N.J.A.C. § 8:57-6.15, for the proposition that Rutgers can exclude unvaccinated students from university housing is misplaced.  First, the express language of these regulations does not give Rutgers the power to ban students from dormitories or evict them when an outbreak arises – they only allow exclusion from classes.  There is good reason for that limited authority; otherwise, during an outbreak, students living in dormitories could be effectively evicted from their principal residence, and rendered essentially homeless, which would be counterintuitive if you are trying to promote public health.

Second, Rutgers' authority to exclude only arises during "a vaccine-preventable disease outbreak."  Plaintiffs' allegations, which must be accepted as true at this stage, allege that COVID-19 is not a vaccine-preventable disease, because there is no vaccine that prevents COVID-19.  FAC ¶¶ 140-143.  If COVID-19 vaccines do not

prevent infection or transmission, then COVID-19 cannot be a "vaccine-preventable disease" and Rutgers cannot exclude students under these rules.

Additionally, *Jacobson* stands for the proposition that a state legislature makes the determination that vaccination is necessary and can delegate that authority to a board of health.  197 U.S. at 27 ("appropriate for the legislature to refer that question… to a Board of Health").  If *Jacobson* stands for anything it stands for the proposition that the power to mandate vaccines is a police power to be exercised or delegated by the State Legislature.  In *Jacobson*, Massachusetts delegated that authority to local boards of health.  New Jersey has delegated that authority to the Department of Health and under particular more limited circumstances to the Governor, the Commissioner of Health or local health officers.  New Jersey has not delegated such authority to private and public institutions of higher education and therefore Rutgers lacks the prerequisite authority to mandate vaccines that *Jacobson* requires.  And none of the government actors who are truly empowered to mandate compulsory vaccination in New Jersey have mandated COVID-19 vaccines for college attendance.

Finally, in the alternative, if this Court were to find that Rutgers has authority under N.J.A.C. 8:57-6.4(c), it is bound to exercise its authority in accordance with ACIP recommendations concerning COVID-19 vaccines.  The ACIP recommendations (upon which Rutgers relies) are tethered to compliance with 21 U.S.C. § 360bbb-3's requirement that recipients of these vaccines have a right to accept or refuse administration; as a result, ACIP's recommendations expressly

require a recipient to receive Fact Sheets stating they have the option to refuse.  *See e.g. https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/mm7044e2-H.pdf* ("Before vaccination providers should provide the EUA Fact Sheet for the vaccine being administered and counsel vaccine recipients about expected systemic and local reactogenicity."). Rutgers cannot claim it has authority to adopt "additional requirements for student immunizations" that are "recommended by the ACIP" and then impose a vaccine mandate that nullifies the informed consent in the Fact Sheets ACIP recommends for administration of these vaccines.  Assuming arguendo, that N.J.A.C. 8:57-6.4(c) gives Rutgers authority, whatever immunization requirement it adopts must comply fully with the ACIP recommendation.  FAC ¶ 230.

### F.  Plaintiffs Have Successfully Pled Breach of Contract.

Defendants move to dismiss this claim by arguing a different set of facts, not accepting Plaintiffs' version of the facts as true.  They argue that the "contract" at issue was formulated in the Fall of 2021, after the mandate was announced.  Brf. at 29.  They also argued that Plaintiffs have failed to allege a contract "with the terms they posit."  Brf. at 29.

New Jersey courts have equitably read the existence of a contract from the enrollment terms and conditions between a university and its students to assess the legal rights and conduct between them.  *See e.g. Beukas v. Board of Trustees of Fairleigh Dickinson Univ.*, 255 N.J. Super 420 (1992) (assuming that the various university bulletins constituted an enforceable contract); *Gourdine v. Felician College,* 2006 WL

23462578 (N.J. App. Div. 2006) (unreported) at *2 ("to the extent that plaintiffs seek to enforce a contractual right… that contract includes the college catalog's reservation of rights to alter or to eliminate the program to which they were enrolled"); *but see Dougherty v. Drew University*, 534 F. Supp. 3d. 363, 374 (D.N.J. 2021) (following *Beukas* but reviewing "the bona fides of the [University's] decisionmaking and the fairness of its implementation" for COVID-19 remote learning rather than pure contract theory). Plaintiffs' breach of contract claim rests on the terms and conditions of enrollment at Rutgers university and the alleged absence of any condition or reservation that Rutgers could command or alter public health measures as a condition of enrollment (e.g. vaccine requirements, health testing, or masking).  FAC ¶ 338.

### G. Plaintiffs Have Properly Pled Estoppel.

"Promissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promise will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Goldfarb v. Solimine*, 245 N.J. 326, 339-340 (2021); *see also Housing Authority of City of Atlantic City v. State*, 188 N.J. Super 145, 149 (1983) (estoppel arises from "a representation, knowledge that a second person is acting on the basis of the representation, and substantial detrimental reliance by the second person… the first person is prohibited from repudiating the truth of his representation.")  *Id.*  (citing *Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 N.J. 334, 339 (1979).  Plaintiffs have pled a plausible claim on these elements.

The FAC alleges that on January 22, 2021, Rutgers told students that COVID-19 vaccines would not be required for students to return to campus for in-person instruction.  FAC ¶ 191.  Rutgers made this official announcement in a video produced by Rutgers to assure students that Rutgers was not mandating the vaccine. FAC ¶ 191.  Since Rutgers produced the video and distributed it to students and staff, Rutgers made these representations with knowledge they would rely and act on it. And, as alleged, Plaintiffs relied on these representations "to accept offers of admission to its colleges, avoid seeking transfers to other colleges and universities, or entertain other alternatives to in-person attendance." FAC ¶191.  Plaintiffs allege that when Rutgers reversed course, they were no longer in a position to arrange to attend a different equivalent college or university.  FAC ¶ 334.  Similarly, Ms. Pinto additionally relied on Rutgers' representation in the Policy that fully-remote students would be exempt.  FAC ¶ 335.  Plaintiffs have suffered detriment in the form of suspension of their studies.  FAC ¶¶ 16, 19, 336.

Rather than accepting Plaintiffs' factual allegations as true, Defendants challenge this claim by presenting alternative facts.  For example, they argue Rutgers' representative intended to make no promises, or that Plaintiffs had sufficient opportunity to attend a different college when Rutgers announced the mandate in March.  Brf. at 31.  These arguments might perhaps be better for a motion for summary judgment.  Concerning Ms. Pinto's estoppel claim, Defendants argue that the Court denied a preliminary injunction on the claim, but that decision was rendered

under a different standard.  Even if Rutgers defines what constitutes a fully-remote student, the text of the Policy was communicated to students with knowledge that it would be acted upon by them, Ms. Pinto relied on that language and was allowed to register for her classes remotely without presenting evidence of COVID-19 vaccination.  Whether the Policy was clear or ambiguous, reasonably relied upon, timely clarified, raises issues of fact that cannot defeat Plaintiffs' reliance claims at this stage.  Plaintiffs have pled estoppel claims and should be permitted to pursue an order estopping Rutgers from repudiating its representations or damages.

## CONCLUSION

For the reasons stated, Plaintiffs respectfully request that this Court deny Defendants' motion to dismiss, or, in the alternative, grant Plaintiffs an opportunity to amend.

Respectfully submitted.

January 11, 2022

GOMEZ LLC
ATTORNEY AT LAW
By: ___*s/ Julio C. Gomez*___
Julio C. Gomez, Esq.
1451 Cooper Road
Scotch Plains, NJ 07076
Tel 908.789.1080
Fax 908.789.1081
jgomez@gomezllc.com
*Attorney for Plaintiffs*